# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CC-00579-COA

**SOUTH PANOLA SCHOOL DISTRICT**                    **APPELLANT**

**v.**

**CAMMIE RONE**                                            **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/01/2019 |
| TRIAL JUDGE: | HON. VICKI B. DANIELS |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | ROBERT RYAN REVERE |
| ATTORNEY FOR APPELLEE: | PRESTON DAVIS RIDEOUT JR. |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 09/15/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GREENLEE, J., FOR THE COURT:**

¶1.    In September 2017, Cammie Rone was dismissed as a school teacher at the Batesville Intermediate School by South Panola School District (SPSD) Superintendent Tim Wilder. Following the dismissal, Rone timely requested a hearing before the South Panola School Board (the Board). The Board, through an appointed hearing officer, held the hearing and issued a report to the Board. The Board reviewed the matters before it, including the report of the hearing officer and the record of the proceedings, and held "that there was substantial and credible evidence to support" Wilder's decision to terminate Rone's employment. Rone appealed this decision to the Panola County Chancery Court. The chancery court reversed the Board's decision and reinstated Rone's employment, finding that the decision was not

supported by substantial evidence. For the reasons below, we affirm the chancery court's judgment.

## FACTS AND PROCEDURAL HISTORY

### I. Termination

¶2. Rone was employed as a second-grade teacher at the school district's Batesville Intermediate School for approximately twenty-three years. During her tenure, Rone never received any disciplinary action. On Sunday, September 17, 2017, Rone received a call from Lashunda Hamilton, the principal of Batesville Intermediate, asking if she could meet to discuss the posting of two racially-inflammatory comments[1] on Facebook. The first comment stated:

> If blacks in this country are so offended [sic] no one is forcing them to stay here. Why don't they pack up and move back to Africa where they will have to work for a living. I am sure our government will pay for it! We pay for everything else.

The second comment stated, "Amen," which was made in response to a comment that another individual had posted. Rone replied to Hamilton that she was traveling back from Jackson, Mississippi, and that she would be available to meet at 5:00 p.m. At the meeting, Rone denied posting the comments, although the screenshots of the comments bore Rone's name ("Cammie Rone") and profile picture. Rone also stated that she could not prove her

---

[1] We use the words "post" and "comment" (as nouns) interchangeably throughout this opinion to identify the social-media communications in dispute. At times, we also use the words "posting" or "posted" as a verb to describe the action that created the alleged communications.

innocence to the school district at that time but that she would contact Facebook administrators to see if her account was hacked. Following the meeting, Hamilton relayed this information back to Wilder, the school district's superintendent, and drafted a statement regarding her conversation with Rone. In her statement, Hamilton recommended Rone's employment be terminated for violating Mississippi Educator Code of Ethics Standard of Conduct 1.1(d).[2]

¶3. On September 18, 2017, Rone met with both Wilder and Hamilton. Wilder asked Rone if she was aware of and if she created the inflammatory comments. Rone responded that she was aware of them, but she denied creating the comments. Wilder then asked if she deleted the comments.[3] Rone denied deleting the comments and stated that she did not know who deleted them. In addition to those questions, Rone explained to Wilder and Hamilton that her Facebook account was not secured with additional protections (such as a two-factor authentication[4]) other than an account password. She also stated that her cellphone was not password protected and that she did not need a password to access her Facebook account while using her phone because her account remained logged in on the phone's Facebook

[2] Mississippi Educator Code of Ethics Standard of Conduct 1.1(d) states, "Ethical conduct includes, but is not limited to the following: . . . [(d)] Providing professional education services in a nondiscriminatory manner."

[3] Wilder testified at the hearing that the comments were deleted around 12:00 p.m. or 1:00 p.m. on Sunday, September 17.

[4] The Facebook two-factor authentication is a additional security feature that requires the user to input a temporary login code, which is sent to the user directly via text message or email, before the user can access his Facebook account.

application.[5] Wilder then told Rone that she would need to prove that her Facebook account was hacked.

¶4.     Rone met with Wilder again on Tuesday, the following day.  At the third meeting, Rone explained that she could not prove that her account was hacked.  According to Rone, the Facebook administrators responded by telling her to change her account's password, but did not provide any other information or additional insight.  After the meeting, Rone received a letter from Wilder, terminating her employment under Mississippi Code Annotated section 37-9-59 (Rev. 2019) for (1) "[v]iolations of [the] Mississippi Code of Ethics generally and also Standard 1 in particular"; (2) "[i]nappropriate behavior"; and (3) "[u]nprofessional conduct and poor judgment."

## II.     Board Hearing on Termination

¶5.     Following the termination, Rone requested an administrative hearing before the Board pursuant to Mississippi Code Annotated section 37-9-111 (Rev. 2013).  A hearing was held on October 16, 2017.

¶6.     At the hearing, the school district presented the testimony of two witnesses to support its decision to terminate Rone.  Jeff Eubanks, the Public Information Director for the SPSD, who managed the school district's internal and external communications, including its website and social media accounts, testified that at around 12:40 p.m. on September 17, he

---

[5] Rone testified that she only accessed her Facebook account on her cellphone.

received a Facebook direct message,[6] alleging that Rone posted two racially-inflammatory comments on Facebook at around 10:00 a.m that morning. The direct message contained screenshots of the alleged comments. Eubanks testified that he reviewed the screenshots and notified Wilder. On cross-examination, Eubanks testified that he did not take any other measures to authenticate the screenshots and that he did not see the actual comments on Facebook. The school district's second witness, Wilder, testified to the facts discussed above. Wilder also testified that he viewed the actual comments on his wife's cellphone. During his direct examination, Wilder testified that he viewed the comments on Rone's "Facebook account." On cross-examination, Wilder testified that he saw the comments on "the [Facebook] news feed."

¶7. After the school district closed its case-in-chief, Rone called three witnesses and testified in her defense. Dr. John Hey, a computer software engineer, testified that he was familiar with Facebook's computer software. He then presented four theories to the Board; each theory portrayed a possible explanation as to who created the Facebook comments. Dr. Hey first theorized that Rone herself could have posted the inflammatory comments on her Facebook account. The second explanation proposed the possibility that Rone's Facebook account was compromised by an unidentified individual (or hacked) and that the unidentified individual posted the comments using Rone's Facebook account. Third, he explained that

---

[6] Eubanks testified that a direct message is "basically . . . an e-mail through Facebook."

someone could have "cloned" Rone's Facebook account, and the person operating the cloned account posted the comments.[7]  Finally, he explained that someone could have manipulated or doctored the screenshots that the school district obtained via direct message.  In addition to those four theories, Dr. Hey testified that "[t]he only way to show that a person made a particular post is to go to that post and . . . to examine . . . what profile is behind the [account's] name."  He explained that all Facebook accounts possess a unique URL.  But when a post (or Facebook account) is deleted, the person searching for that unique URL loses the ability to identify it.  Dr. Hey also testified that he was unable to identify the alleged comments' unique URL because the posts were deleted prior to his investigation.

¶8.     Two witnesses, Warner McBride and Jason Morris, testified to Rone's good character.  Morris also testified that he had never known Rone to take a position over a controversial political or social issue.  Rone then testified in her defense.  Rone did not dispute most of the school district's evidence, but she claimed that she did not create the inflammatory comments.  According to Rone, she left her home at around 9:00 a.m. on the day in question traveling to purchase a bull-calf north of Jackson, Mississippi.  Rone testified that she first stopped to "turn the cows out" and to hookup a trailer at a nearby farm before heading south to the Jackson area.[8]  Rone arrived north of Jackson around 11:15 a.m. and loaded the bull.

---

[7] According to Dr. Hey, "cloning" occurs when someone creates a Facebook account that bears the same profile name (in this instance, "Cammie Rone"), uploads the victim's profile picture, imitates the victim's personal biography, copies, and uploads the victim's other pictures, and "friends" the victim's Facebook friends.

[8] Rone testified that she left the farm traveling to the Jackson area at around 9:50 a.m.

Around 1:15 or 1:30 p.m., Rone began to drive home. Rone testified that on the way back, her brother texted her, asking if she had seen the alleged Facebook comments. Rone replied that she had not. Rone then testified that her brother sent her a screenshot of the comments. After that, Rone testified that she received a call from Hamilton, whom she met with later that day. Rone also testified that she possessed her phone and was logged in on her phone to her Facebook account on the day the comments were posted.

¶9. On November 27, 2017, the Board issued its written order finding that there was substantial evidence to uphold Wilder's decision to terminate Rone's employment on two grounds. The order provided, in pertinent part:

> There was substantial evidence presented at the hearing and submitted to the Board that Mrs. Rone made and posted an inappropriate comment on social media and did not exercise caution to protect her social media an/or online accounts. Further, Mrs. Rone failed to produce evidence to show that her social media accounts had been tampered with or altered.
>
> Having considered the testimony of the witnesses and all exhibits, the Report of the Hearing Officer, and the arguments of counsel, it is the opinion of the Board that Mrs. Rone violated the District's employee conduct policy, violated Mississippi Educator Code of Ethics and conducted herself in an unprofessional manner. Thus, it is the opinion of the Board that the dismissal of Mrs. Rone should be upheld.

### III. Appeal to the Chancery Court

¶10. On December 7, 2017, Rone perfected her appeal to the Panola County Chancery Court. On February 28, 2019, after the parties fully briefed the matter, the chancery court entered its order reversing the Board's decision to terminate Rone and finding the Board's decision lacked substantial evidence on both grounds.

7

¶11.	The school district now appeals the chancery court's decision. In its appeal, the school district raises three issues: whether the Board's decision was supported by substantial evidence; whether the chancery court impermissibly re-weighed the evidence; and whether the chancery court erred by applying the incorrect standard.

## STANDARD OF REVIEW

¶12.	We review a chancery court's decision concerning an agency action by applying the same standard of review that the lower court was bound to follow. *Giles v. Shaw Sch. Dist.*, 203 So. 3d 1165, 1169 (¶12) (Miss. Ct. App. 2016) (citing *Miss. Sierra Club Inc. v. Miss. Dep't of Env't Quality*, 819 So. 2d 515, 519 (¶15) (Miss. 2002)). Here, that standard is set by statute. It reads:

> The scope of review of the chancery court . . . shall be limited to a review of the record made before the school board or hearing officer to determine if the action of the school board is unlawful for the reason that it was:
>
> (a) Not supported by any substantial evidence;
>
> (b) Arbitrary or capricious; or
>
> (c) In violation of some statutory or constitutional right of the employee.

Miss. Code Ann. § 37-9-113(3) (Rev. 2013).

¶13.	"The school board is the administrative agency charged by statute with making the ultimate employment decision in all teacher dismissal and nonrenewal cases." *Noxubee Cnty. Bd. of Educ. v. Givens*, 481 So. 2d 816, 819 (Miss. 1985) (citation omitted). At the hearing, the burden rests on the superintendent to prove by a preponderance of the evidence that there

8

were "adequate grounds for dismissal." *Merchant v. Bd. of Trs. of Pearl Mun. Separate Sch. Dist.*, 492 So. 2d 959, 961 (Miss. 1986). As noted above, the chancery court (sitting as an appellate court) must determine whether the Board's findings of fact are supported by substantial evidence. Miss. Code Ann. § 37-9-113(3)(a); *Givens*, 481 So. 2d at 819.

¶14. "Substantial evidence affords a substantial basis of fact from which the fact in issue can be reasonably inferred." *Leigh v. Aberdeen Sch. Dist.*, 207 So. 3d 1276, 1281 (¶19) (Miss. Ct. App. 2016) (internal quotation marks omitted) (quoting *Amite Cnty. Sch. Dist. v. Floyd*, 935 So. 2d 1034, 1039 (¶7) (Miss. Ct. App. 2005)). It amounts to "more than a mere scintilla of evidence, and does not rise to the level of a preponderance of the evidence." *Id.*

¶15. In addition, the school board's decision may not be arbitrary or capricious. Miss. Code Ann. § 37-9-113(3)(b). "An administrative agency's decision is arbitrary when it is not done according to reason and judgment, but depending on will alone." *Burks v. Amite Cnty. Sch. Dist.*, 708 So. 2d 1366, 1370 (¶14) (Miss. 1998). An act is capricious if it is done without reason, "in a whimsical manner, implying either lack of understanding of or a disregard for the surrounding facts" and settled controlled principles. *Id.*

## DISCUSSION

¶16. Following the hearing on termination, the Board upheld Wilder's decision to terminate Rone on two independent grounds. First, the school district found substantial evidence that Rone "violated the . . . employee conduct [policy and the] Mississippi Educator Code of Ethics" by authoring the racially inflammatory Facebook posts. Second, the school district

9

found that Rone "exercis[ed] poor judgment" by failing to adequately protect her social media account. The chancery court reversed the school board's decisions, finding both decisions lacked substantial evidence. Now, on appeal, the school district claims that the chancery court erred by finding that the Board's decisions were not supported by substantial evidence. We first review whether school board's findings were supported by substantial evidence. We then address the school district's remaining contentions.

## I. The chancery court did not err by finding that there was no substantial evidence that Rone authored the alleged posts.

¶17. The school district contends that there was substantial evidence showing that Rone created the Facebook posts and that she failed to prove her innocence at the administrative hearing. The school district also takes issue with the chancery court's opinion, claiming that the chancery court failed to "mention [Wilder's] testimony" and "[Eubanks'] testimony" and by failing to include evidence that "Rone was active on [F]acebook . . . on the day in question." In relation to the Board's first finding, the chancery court's opined:

> In the case at hand the evidence provided by the school board was two unauthenticated screenshots of two comments on a [F]acebook post made allegedly by Cammie Rone and the testimony of Tim Wilder that he saw the comments. Mr. Wilder also testified that he did not know that Cammie Rone made them. The posts were deleted by whomever made them and there was no confirmation of whether Cammie Rone's account made them or if a "cloned" account using Cammie Rone's identity made the posts.

> This Court believes the South Panola School District lacked substantial evidence on this issue to justify her termination. [In] this day and age where the ability to assume someone's identity online is incredibly easy this Court is hesitant to consider this evidence as "substantial" with no further corroboration or investigation into IP addresses being used. The Court does not disagree that

10

the comments were reprehensible and would have justified termination had there been substantial evidence to support their decision. This Court is not disputing any of the facts that are presented. However, the ease at which a [F]acebook account can be cloned (for which no steps can be taken to prohibit this action) and the frequency in which that occurs, makes it extremely important to have proper verification that the alleged post was created and posted by Cammie Rone before terminating her or any other person in her situation.

¶18. In its brief, the school district relies heavily on *Harris v. Canton Separate Public Board of Education*, 655 So. 2d 898 (Miss. 1995), to support its contention that there is substantial evidence that Rone created the posts.

¶19. In *Harris*, the Board terminated the principal's employment, following an alleged assault of another employee. *Id.* at 899. At the hearing on termination, both the principal and the employee presented directly conflicting testimony regarding the assault. *Id.* at 901-02. On appeal, our supreme court stated "[w]here there is a conflict of testimony presented to the board, the board is entitled to determine which testimony it will give the most weight." *Id.* at 902 (citation omitted). The court continued "[c]ertainly the Board was in a position, as neither the Chancellor nor this Court can be, to evaluate the demeanor of the witnesses at the hearing, and it is this Court's policy to accord great weight and deference to the school administrators when their discharge of responsibilities is challenged." *Id.* (citation omitted).

¶20. We do not disagree with the school district that deference is given to the Board during these appeals. *See id.* at 902 (citing *Noxubee Cnty. Bd. of Educ.*, 481 So. 2d at 819). We also agree that the Board is better situated to evaluate the credibility of the witness. But unlike *Harris*, the instant case is without a considerable amount of conflicting testimony. The

11

parties dispute whether Rone posted the inflammatory comments, but the facts leading to that inference are largely undisputed. After review, we find that the record lacks credible, inculpatory evidence.

¶21. At Rone's hearing, the school district presented two witnesses. Eubanks testified that the direct message contained screenshots of the alleged comments. On cross-examination, Eubanks was asked whether he took any additional measures to authenticate the direct message that was sent to him. Eubanks responded, "No," and he stated that he did not see the actual comments on Rone's Facebook page. Wilder testified that he viewed the actual posts on his wife's phone, but the record is unclear as to *when* Wilder viewed the actual comments and *where* Wilder viewed those comments on Facebook. As to the "when," Wilder never testified to the time he viewed the actual posts on Facebook. We do, however, attempt to determine that time by piecing together other evidence included in the record. The record shows that the alleged comments were posted on Facebook at around 10:00 a.m. on Sunday, September 17. Eubanks testified that he received screenshots of the alleged comments via direct message at around 12:40 p.m. that same day. Eubanks also testified that he notified Wilder of the posts after reviewing the contents of the direct message. Wilder testified to (and wrote in his September 18 statement) that the alleged comments were deleted from Facebook "2 to 3 hours" after they were posted. As such, we presume that the comments were deleted sometime between 12:00 and 1:00 p.m. on Sunday, September 17, as there is no other evidence in the record indicating to this Court when the comments were

12

deleted. We also give the school district the benefit of the doubt by concluding that Wilder viewed the actual comments some time after 12:40 p.m. but before 1:00 p.m. As to the "where," Wilder testified on direct examination that he (and his wife) viewed the alleged comments on Rone's "Facebook account." On cross-examination, however, Wilder testified that he viewed the actual posts on the Facebook "news feed." We find this discrepancy significant because the Facebook news feed services a different function than an individual's Facebook account and manages a more diverse set of Facebook communications than those situated on an individual's Facebook account (or profile). Because of the discrepancy, we also cannot nullify the possibility that Rone's Facebook account was "cloned."

¶22. At the end of Wilder's testimony, Wilder conceded to not knowing whether Rone authored the alleged comments. The school district then rested its case-in-chief. Rone's expert witness, Dr. Hey, testified that during his investigation he discovered that Rone's Facebook account was "active" on the day the comments were made. But he also testified that "there was nothing in [her activity feed] about [the alleged comments]." Rone testified that her Facebook account was logged in on her phone on the day in question, but the record does not include time stamps demonstrating when Rone was active on Facebook. The fact that Rone was "active" on Facebook on the day the inflammatory comments were made does not create a reasonable inference that Rone posted the objectionable comments anywhere on Facebook. Rone also denied deleting the alleged comments. At the hearing, the school district did not ask Rone whether she deleted the comments, but the school district admitted

13

exhibits showing that Rone denied deleting the comments.

¶23. Upon review, we remain mindful that the crux of this issue is whether there is substantial evidence that Rone authored the social-media posts. At this point, it appears that the record generates an ample amount of uncertainty and lacks "more than a scintilla of evidence" required for a finding of substantial evidence. *Leigh*, 207 So. 3d at 1281 (¶19) (citation omitted).

¶24. There is a contemporary line of cases that address the issue of authenticating social-media posts (for evidentiary purposes). In *Smith v. State*, 136 So. 3d 424, 431 (¶16) (Miss. 2014), a case of first impression, our supreme court considered the issue of whether the defendant's Facebook messages were sufficiently authenticated at trial. The court recognized that

> concern over the authentication arises because anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's username and password, and, consequently, [t]he potential for fabricating or tampering with electronically stored information on a social networking sight is high, and poses challenges to authenticating printouts from the website . . . . [A]n electronic communication, such as a Facebook message, . . . could be generated by someone other than the named sender . . . . Facebook presents an authentication concerning that is twofold. First, because anyone can establish a fictitious profile under any name, the person viewing the profile has no way of knowing whether the profile is legitimate. Second, because a person may gain access to another person's account by obtaining the user's name and password, the person viewing communications on or from an account profile cannot be certain that the author is in fact the profile owner.

*Id.* at 432 (¶19). Because of these concerns, the court found that "the fact that an electronic communication on its face purports to originate from a certain person's social networking

14

account is generally insufficient standing alone to authenticate that persons as the author of the communications." *Id.* at 433 (¶20). And that "something more than simply a name and small, blurry photograph purporting to be [the defendant was] needed to identify the Facebook account as [the defendant's] in the first place." *Id*. The court stated in a non-exhaustive list that "something more" could include that

[(1)] the purported sender admits authorship,

[(2)] the purported sender is seen composing the communication,

[(3)] business records of an internet service provider or cell phone company show that the communication originated from the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have access to the computer or cell phone,

[(4)] the communication contains information that only the purported sender could be expected to know,

[(5)] the purported sender responds to an exchange in such a way as to indicate circumstantially that he was in fact the author of the communication, or

[(6)] other circumstances peculiar to the particular case may suffice to establish a prima facie showing of authenticity.

*Id.* at (¶21) (citations omitted).

¶25. Similarly, in *Clay v. State*, 151 So. 3d 1018, 1020 (¶10) (Miss. Ct. App. 2014), this Court, under the guidance of *Smith*, reviewed whether the trial court erred by allowing certain Facebook posts into evidence. In short, we determined that the State had failed to make a prima facie case that the Facebook comments were that of the defendant because

there was no testimony that the photograph in the Facebook profile was [the

15

defendant.] The [Facebook] profile state[d] the account belong[ed] to a "Crystal Clear," who was born on March 4; graduated from Clarksdale High School; speaks Japanese, Chinese, and English; and lives in Paris, France. No personal information regarding [the defendant] was elicited to determine whether the profile was hers. Furthermore, [the defendant] did not admit authorship of these postings, nor was there testimony [that] she was seen composing these comments. The only testimony concerning [the defendant's] Facebook usage occurred prior to the altercation with [the victim], which only established that [the defendant] had used [the victim's computer] in the past to log in to her Facebook account. This testimony also highlights concerns regarding the susceptibility of [the defendant's] Facebook account to a potential security breach.

*Id.* at 1021 (¶13).

¶26. Analogous to *Clay*, the evidence in the instant case fails to connect Rone or Rone's Facbook account to the alleged comments. While the screenshots of the comments show that a Facebook user named "Cammie Rone" authored the posts and contain a small and blurry profile picture that allegedly matched Rone's profile picture at the time of the posting, this evidence (a name and profile picture purporting to be the defendant) alone is not enough.[9] *Smith*, 136 So. 3d at 433 (¶20). The record shows that Rone repeatedly denied authorship, and there is no testimony showing that someone witnessed Rone create the posts. The record also contains no business records from an internet service provider or cell phone company showing that the Facebook posts originated from Rone's cellphone. There is also no evidence directly challenging Rone's claim that she did not delete the posts. We also find no evidence peculiarly connecting Rone to the particular posts. In fact, the record lends

---

[9] From the record, it is difficult to discern the objects purported in the profile picture, as the picture is small and unclear.

16

strength to a finding against substantial evidence because there is evidence in the record that Rone's typical Facebook posts relate to sharing cattle and cattle shows. Finally, we find no evidence demonstrating that Eubanks, Wilder, or any other individual viewed the Facebook profile that created the alleged posts. Because of these findings, we must agree with the chancery court that the record lacks substantial evidence showing that Rone created the alleged inflammatory posts. *See Wilder v. Bd. of Trs. of Hazlehurst City Sch. Dist.*, 969 So. 2d 83, 93 (¶36) (Miss. Ct. App. 2007) (citations omitted) ("Substantial evidence means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred."). We also dismiss any claim that Rone was required to prove her innocence at the hearing. *See Webb v. S. Panola Sch. Dist.*, 101 So. 3d 724, 728 (¶10) (Miss. Ct. App. 2012) (citations omitted) ("[T]he burden rests on the superintendent to prove by a preponderance of the evidence adequate grounds for dismissal.").[10] We now turn to school board's second finding.

## II. Whether the chancery court erred by finding that there was no substantial evidence that Rone exercised poor judgment.

¶27. The Board also upheld Wilder's decision to terminate Rone for exercising poor judgment by failing to adequately protect her Facebook account. According to the school

---

[10] The dissent and Board assume that the comments on Facebook came from Rone's account. Eubanks testified that he viewed screenshots of the comments, but he did not view the actual comments on Facebook. Wilder testified that he viewed the comments on Rone's "Facebook account." But on cross-examination, Wilder testified that he saw the comments on the "Facebook newsfeed," and he admitted he did not know whether or not Rone authored them.

district, Rone violated-employee conduct policy by not protecting her cellphone with a password, by not setting up a two-factor authentication on her Facebook account, and by not logging out of her Facebook account on her cellphone's Facebook application. The employee conduct policy that the school district claims Rone violated reads as follows:

> Employees of the South Panola School District are expected to conduct themselves in a manner that will reflect positively on the school district and the community, thus promoting a positive environment for teaching, learning and student well-being. The dignity of students and of the education environment shall be maintained at all times. Unseemly dress, conduct or the use of abusive, foul or profane language in the presence of students is expressly prohibited and will not be tolerated. *With the prevalence of technology and social networking, professional conduct must be maintained in these arenas as well to protect individuals' rights and the integrity of the institution.*

(Emphasis added). The chancery court reversed the Board's decision to terminate Rone's employment on this ground, finding:

> The South Panola School District also relied on the fact that Cammie Rone did not take adequate steps to protect her social medica accounts. The Court also finds that they lacked substantial evidence to support this determination. The School District bases this decision on Cammie Rone's testimony that her [F]acebook account and her phone are not password protected. The expert who discussed "cloning" a [F]acebook account testified that passwords and privacy settings do not protect against such actions. All [F]acebook accounts are password protected, but her phone was not password protected and [F]acebook could be accessed on it without using a password. Cammie Rone also testified that she only used Facebook on her phone and that to her knowledge no one else had access to her cell phone. There was no evidence provided that anyone accessed her phone or her account. Therefore, the Court feels that there is no substantial evidence that Cammie Rone did not adequately protect her social media by having [F]acebook on her cell phone

¶28. Rone testified that her only means of accessing Facebook was through an application on her cellphone. She testified that her cellphone was not password protected. According

18

to Rone, her husband and daughter had access to her cellphone, but they "rarely" used her phone. The school district asserts that Rone violated employee-conduct policy because "anyone would have access to [Rone's] cellphone and . . . [F]acebook account [if] she left her phone unattended[.]" The school district contends,

> All Rone had to do was put a password on her phone, require a password each time someone tried to [log in] to [F]acebook[,] or set up [the] two[-]factor authentication [security protection on her account.] Each of these security measures takes just a matter of moments to put in place, but Rone did not even take those minimal steps.

¶29. Upon review, we find no evidence hinting at the possibility that someone used Rone's cellphone to access Rone's Facebook account on the day the alleged posts were made. There is also no evidence showing that Rone did not have her phone that day; instead she testified she had her phone. For these reasons, we disagree with the school district that Rone exercised poor judgment on Sunday, September 17. We also conclude that these actions did not violate the school district's employee-conduct policy as such finding is arbitrary and capricious. *See Baptist Mem'l Hosp.-DeSoto Inc. v. Miss. State Dept. of Health*, 214 So. 3d 277, 281 (¶13) (Miss. 2017) ("But if [the school district's] decision is not based on substantial evidence, then it necessarily follows that the decision is arbitrary and capricious." (citations and internal quotation marks omitted)).

¶30. The school district also argues that it is immaterial whether actual harm resulted from Rone's failure to protect her phone with a password. The school district claims that "[t]he moment Rone violated District policy and standards[,] she subjected herself to dismissal

19

regardless of whether the District suffered some type of injury or harm." The record shows that Rone's Facebook account was password protected: all Facebook accounts are password protected. We acknowledge that Rone remained logged in to her Facebook account on her cellphone, but we find that this admission does not violate the plain language of the employee-conduct policy. Therefore, we find the school district's claim here is without merit.[11]

### III. Whether the chancery court erred by applying the incorrect standard.

¶31. Finally, the school district argues the chancery court erred by requiring the school district to authenticate Rone's Facebook comments. According to the school district, "this type of 100% conclusive proof goes above and beyond the substantial evidence standard [required in these types of hearings.]" After reviewing the chancery court's opinion, we are not convinced that the chancery court's ruling heightened the substantial-evidence standard. While relying on *Smith* and *Clay*, we, too, recognize that "something more" is required in cases of this nature, as there are "special concerns regarding [social media] fabrication." *Smith*, 136 So. 3d at 433 (¶20). We also disagree with the school district that the chancery

---

[11] The dissent asserts that "[a]ssuming Rone did not in fact make the subject posts, then someone with her used her phone and made the posts." That assumes the post came from her account, which the Board did not show. It also ignores someone may have cloned Rone's Facebook account, hacked her account or posted an altered screenshot. Rone testified that she did not post or delete the comments. Dr. Hey testified that Rone's Facebook account may have been cloned or hacked or that an altered screenshot purporting to be Rone may have been posted.

20

court re-weighed the evidence. These contentions are without merit.

## CONCLUSION

¶32. The Board's decisions in this case are not support by substantial evidence. The school district's other arguments are without merit. This Court therefore affirms the Panola County Chancery Court's judgment reversing the judgment of the Board and rendering Rone's employment to her position and awarding all lost pay that Rone would have earned in the period since her termination.

¶33. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J. AND LAWRENCE, J., CONCUR. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., McDONALD AND McCARTY, JJ.**

**WESTBROOKS, J., DISSENTING:**

¶34. I find no error with the Board's decision to terminate Rone. The Rules of Evidence are relaxed during an administrative agency hearing. Because I believe that the Board, as the fact finder, acted within their authority and the evidence was substantiated, I respectfully dissent.

¶35. On September 17, 2017, Jeff Eubanks, the public information director for the South Panola School District, was advised of two separate Facebook posts Cammie Rone made. Eubanks reviewed the posts made from Rone's account bearing her name and her picture. The first post contained the following quote from Rone's account: "[I]f blacks in this country are so offended no one is forcing them to stay here. Why don't they pack up and move back

21

to Africa where they will have to work for a living. I am sure our government will pay for it! We pay for everything else." The second post from Rone's account said, "Amen," in response to a previous post made by another Facebook user, which stated, "[B]et they won't protest them welfare checks."

¶36. The South Panola School District states in its "Employee Conduct Rules," teachers are "expected to conduct themselves in a manner that will reflect positively on the school district and the community, thus promoting a positive environment for teaching, learning and student well-being." With regard to the use of social media, the "Employee Conduct Rules" specifically says that "[w]ith the prevalence of technology and social networking, professional conduct must be maintained in these arenas as well to protect individuals' rights and the integrity of the institution." Regarding violations, the policy is clear: "violations, or continuous violations of this policy may lead to an employee being suspended, dismissed or non-renewed." Cammie Rone was terminated for two separate violations of District policy: (1) posting racist comments on Facebook, and (2) failing to take any steps whatsoever to secure her phone and Facebook account. After a hearing, the Board confirmed the Superintendent's decision. The chancery court reversed the Board's decision to terminate Rone, and the District appealed. The lead opinion finds no error with the chancellor's decision to reinstate Cammie Rone to her position as an elementary school teacher. I disagree.

¶37. After seeing the posts, Eubanks contacted Superintendent Tim Wilder. That same

22

morning, Wilder had been alerted to the posts. Wilder and his wife went to Rone's Facebook account to see if the posts were actually on her account or just someone purporting to be her. Both Wilder and his wife saw and verified that the posts were in fact on Rone's actual account. Someone from Facebook subsequently removed the posts. Knowing that the posts would have a negative impact on the school district, Wilder contacted Lashunda Hamilton, the principal at Rone's school. Rone was contacted and asked to come meet with Hamilton and the assistant principal, Carey Allen. Rone was in the middle of picking up cattle and unloading them, so the meeting did not take place until 5:00 p.m. that evening.

¶38. At the meeting, Rone stated her brother texted her about the posts while she was driving with her mother and daughter to pick up cows. Rone stated that she was active on Facebook that day but was not the person who made the subject posts. She stated that someone must have hacked her account. She offered no further proof or explanation. Following the meeting, Hamilton recommended Rone be terminated for violating the Mississippi Educator Code of Ethics.

¶39. The next day, on September 18, 2017, Wilder and Hamilton met with Rone and her brother. At this meeting, Rone admitted she had taken no precautions to protect her Facebook account or her phone from unauthorized use. Specifically, Rone stated neither her phone nor her Facebook account were password protected. Essentially, anyone who picked up Rone's phone could access everything, including Rone's Facebook account. Rone again offered no proof or explanation for what happened other than that her account must have been hacked.

23

Rone offered no proof or examples of the signs of hacking. She just said she did not make the posts, and her account must have been hacked or accessed by someone else without permission.

¶40. Wilder met with Rone again on September 19, 2017. Rone again offered no further specifics, evidence, or explanation. Nor did Rone offer or even suggest that she was attempting to verify what, if anything, happened to her account. She just denied making the posts. Wilder terminated Rone for making the posts and for failing to adequately protect her account.

¶41. Rone requested and received a hearing on October 16, 2017, pursuant to Mississippi Code Annotated section 37-9-111 (Supp. 2012). Eubanks, Wilder, Rone, and Dr. John Hey all testified at the hearing. Eubanks, Wilder, and Rone all testified consistently with prior statements. Rone called Dr. Hey to testify regarding possible explanations for the posts. Due to the relaxed nature of the administrative hearing the rules of evidence were not applicable, and Dr. Hey was allowed to testify without being qualified as an expert in any field.

¶42. Dr. Hey could offer no evidence or proof as to any explanation regarding how the posts ended up on Rone's account. Dr. Hey said either Rone made the posts, someone with access to Rone's account made the posts, Rone's account was hacked, or Rone's account was cloned. When specifically asked if he had any evidence to support any contention besides Rone making the posts, Dr. Hey stated obtaining such evidence would be "impossible."

¶43. Wilder testified at the hearing that after reviewing the posts, he felt it would be

24

impossible for Rone to successfully teach. Wilder stated the racist Facebook posts would have a "very negative impact on the School District environment as far as teaching children of multiple racial backgrounds." Wilder testified Rone's school was approximately 65% African American and that Rone's class was approximately 85% African American.

¶44. Rone herself offered no evidence that her account had been hacked or cloned or that someone else had used her phone. Rone offered no testimony indicating that she was trying to verify anything she claimed other than allegedly emailing Facebook. However, she offered no proof of emailing anyone. She stated she had no computer and that her phone was the only way to access Facebook. The school board unanimously upheld the District's decision. Rone appealed and obtained a re-instatement by the Chancery Court. The District appealed.

¶45. Mississippi Code Annotated section 37-9-59 (Supp. 2019) states that for "incompetence, neglect of duty, immoral conduct, intemperance, brutal treatment of a pupil or other good cause the superintendent of schools may dismiss or suspend any licensed employee in any school district." Mississippi Code Annotated section 37-9-111(6) governs procedures for hearings like the one Rone appealed to chancery court and states that "[i]n conducting a hearing, the board or hearing officer shall not be bound by common law or by statutory rules of evidence or by technical or formal rules of procedure."

¶46. In addition to the statutory authority cited above, Mississippi appellate courts have clearly and consistently explained the procedure, standard of review and issues currently before this Court. "When considering termination cases, this Court's scope of review is quite

25

limited." *Byrd v. Greene Cnty. Sch. Dist.*, 633 So. 2d 1018, 1022 (Miss. 1994). "When this Court reviews a decision by a chancery or circuit court concerning an agency action, it applies the same standard of review that the lower courts are bound to follow." *Webb v. S. Panola Sch. Dist.*, 101 So. 3d 724, 727 (¶7) (Miss. 2012) (quoting *Hinds Cnty. Sch. Dist. Bd. of Trs. v. R.B. ex rel. D.L.B.*, 10 So. 3d 387, 394 (¶17) (Miss. 2008)). "We accept our duty of deference to the hearing officials and this is no different when those officials are the ultimate legal authority for the school district. We look to see whether the decision of the Board is supported by substantial evidence, was arbitrary or capricious, was beyond the power of the board to make, or violated some statutory or constitutional right of the complaining party. Most assuredly, by way of contrast, the test is not what we would have decided had we been the trier of the issues in dispute." *Byrd*, 633 So. 2d at 1022 (quoting *Hoffman v. Bd. of Trs. v. Miss. Junior Coll.*, 567 So. 2d 838, 842 (Miss. 1990)).

¶47. As outlined by statute, termination hearings are less formal than criminal and civil matters in circuit court or county court. "In a hearing such as the one here, the school board is not bound by rules of evidence and procedure as in a trial court where an experienced judge presides over the hearing." *Jackson v. Hazelhurst Mun. Separate Sch. Dist.*, 427 So. 2d 134, 136 (Miss. 1983). Likewise, the burden of proof is not as heightened as clear and convincing or beyond a reasonable doubt. "[T]he Mississippi Supreme Court has held that 'at a board hearing on termination, the burden rests on the superintendent to prove by a preponderance of the evidence adequate grounds for dismissal.'" *Webb*, 101 So. 3d at 728

26

(¶10) (quoting *Harris v. Canton Separate Pub. Sch. Bd. of Educ.*, 655 So. 2d 989, 902 (Miss. 1995)). However, "a rebuttable presumption exists in favor of the administrative agency, and the challenging party has the burden of proving otherwise." *Rivers v. Bd. of Trs., FCAHS*, 876 So. 2d 1043, 1046 (¶12) (Miss. Ct. App. 2004).

¶48.    When facts are in dispute, it is the Board's decision which side is more credible. "Lastly, this Court must not re-weigh the facts of the case or insert its judgment for that of the agency." *Id.* "Where there is a conflict of testimony presented to the board, the board is entitled to determine which testimony it will give the most weight." *Everrett v. Bd. of Trs. Meridian Mun. Separate Sch. Dist.*, 492 So. 2d 277, 283 (Miss. 1986) (citation omitted). "Neither the appellate court nor the chancery court can substitute its judgement for that of the agency or re-weigh the facts of the case." *Webb*, 101 So. 3d 727 (¶7) (citations omitted). "Where the record supports one valid and viable reason to dismiss a teacher, that fact cannot be sidestepped, and the board's decision will not be disturbed." *Hester v. Lowndes Cnty. Sch. Dist.*, 137 So. 3d 325, 329 (¶14) (Miss. 2013) (quoting *Spradlin v. Bd. of Trs. of Pascagoula Mun. Separate Sch. Dist.*, 515 So. 2d 893, 899 (Miss. 1987)).

¶49.    The Mississippi Supreme Court has consistently given deference to the Board. "Apparently, after the he said/she said drama of the hearing, the board chose to believe Houston. Where there is a conflict of testimony presented to the board, the board is entitled to determine which testimony it will give the most weight." *Harris*, 655 So. 2d at 902 (internal quotation marks omitted) (quoting *Everett*, 492 So. 2d at 283). "Certainly the Board

27

was in a position, as neither the Chancellor nor this Court can be, to evaluate demeanor of the witnesses at the hearing, and it is this Court's policy to accord great weight and deference to school administrators when their discharge of responsibilities is challenged." *Id*. (citation omitted).[12]

¶50.    Rone was terminated on two independent grounds. First, as the lead opinion writes, "[T]he school district found substantial evidence that Rone 'violated the employee conduct [policy and the] Mississippi Educator Code of Ethics' by authoring the racially-inflammatory posts." Second, as the lead opinion writes, "[T]he school district found that Rone 'exercis[ed] poor judgment' by failing to adequately protect her social media account."

### I.    *Was there substantial evidence to support Rone's termination regarding the racially-inflammatory posts?*

¶51.    There was zero evidence presented at the hearing, by Rone or through her attorney, that the subject posts were not posted by Rone onto Facebook—except Rone's denial. The Board's decision to terminate Rone for making the racist Facebook posts was supported by substantial evidence. The Board heard and received evidence of two documented Facebook posts. The first Facebook post from Rone's account stated, "[I]f blacks in this country are so offended no one is forcing them to stay here. Why don't they pack up and move back to Africa where they will have to work for a living. I am sure our government will pay for it. We pay for everything else." The second Facebook post from Rone was, "Amen," responding

---

[12] The fact that the lead opinion can assert that the Board "assumed" is a posture that second guesses the decision of the fact finder—the Board.

to another Facebook user posting, "[B]et they won't protest them welfare checks."

¶52.    Jeff Eubanks, the public information director for the South Panola School District who manages the district's social media accounts, testified that he was notified of and looked at the posts from Rone. When asked if he did anything to authenticate the posts from Rone's account, Eubanks testified that the post was already removed from Rone's page. However, when asked if he had any reason to believe that Rone was not the author of the post, Eubanks stated, "In my opinion, no."

¶53.    Superintendent Tim Wilder testified that he saw the posts on Rone's actual Facebook page before they were deleted. In fact, Wilder testified that he and his wife both looked at the posts prior to their removal from Rone's Facebook page. More specifically, Wilder testified that he "had someone go on Ms. Rone's Facebook account that morning and look to see that this (the racial post) was actually on her Facebook account, and it was."

¶54.    Rone called Dr. Hey to testify on her behalf. Due to the nature of the hearing, Dr. Hey was not required to be qualified as an expert, much like the subject posts were not required to be authenticated prior to their being admitted into evidence. That being said, just as Eubanks and Wilder were allowed to testify as to their conclusions about the posts, so too was Dr. Hey allowed to testify concerning his thoughts and conclusions regarding the subject posts. Dr. Hey was not an expert in social media or Facebook. Dr. Hey testified that he writes software for "medical office billing, software to computerize the docket systems in the Leflore County Circuit and County Courts, and software to manage the voter rolls of Leflore

29

County back in the 1990's."

¶55. Dr. Hey testified that there were four explanations for how the posts originated. First, Rone made the posts and deleted them after realizing they were not private. Second, someone other than Rone used Rone's phone and made and deleted the post. Third, someone hacked Rone's Facebook account. Last, Dr. Hey said someone made a cloned account. Dr. Hey offered no evidence to support the contention that someone cloned Rone's account. Dr. Hey offered no evidence to support the hacker theory. Dr. Hey offered no evidence to show someone other than Rone used her account. Dr. Hey offered no evidence that Rone did not make the posts. He had no evidence on how to explain what happened to Rone's account if she did not write the posts. When asked whether he had any evidence that Rone did not make the posts he replied, "I have no evidence because no evidence can exist to that fact."

¶56. When asked if she made the posts, Rone stated, "No, I did not." Rone also testified that she can only access Facebook through her cell phone. Rone has no home computer. When asked who has access to her phone, Rone stated that her husband and daughter have access to her phone. Rone offered no evidence or explanation as to how, if she did not do it, the posts got on Facebook and how they were deleted.

¶57. The lead opinion relies on "a contemporary line of cases that address the issue of authenticating social media posts (for evidentiary purposes)." In essence, the lead opinion states that substantial evidence does not exist due in large part on the failure of the district to authenticate the Facebook posts according to Mississippi Rule of Evidence 901, *Smith v.*

30

*State*, 136 So. 3d 424 (Miss. 2014), and *Clay v. State*, 151 So. 3d 1018 (Miss. Ct. App. 2014). However, such a line of reasoning and analysis is inapplicable based upon Mississippi Code Annotated section 37-9-111(6). As stated earlier, "[i]n a hearing such as the one here, the school board is not bound by rules of evidence and procedure as in a trial court where an experienced judge presides over the hearing." *Jackson*, 427 So. 2d at 136. Both sides "benefitted" from the relaxed procedure. Dr. Hey would most certainly have been struck as an expert under the rules, and arguably authentication of the posts could have possibly presented some issues. But this was not a criminal trial in a circuit court. This was a termination review hearing. While not applicable, utilizing the rules of evidence here, as the lead opinion suggests, works both ways. The posts themselves would have to be authenticated, and Dr. Hey would have to be qualified as an expert. If both sides lost that testimony and evidence, Rone still loses. Without Dr. Hey's testimony and the images of the Facebook posts, Wilder testifies he saw the posts, Wilder's wife testifies she saw the posts, Principal Hamilton testifies she was called about the posts and Rone simply denies making the posts. Under the clear standard of review, the decision is upheld.

¶58.    Notwithstanding the fact that the Rules of Evidence do not control or even apply in termination cases such as Rone's, the cases cited by the lead opinion are distinguishable. Both *Smith* and *Clay* involve criminal proceedings, not administrative proceedings concerning a termination. There was no testimony that Smith or Clay were active on Facebook when the content was posted. Here, it is undisputed that Rone was active all during

31

the time the subject posts were made and removed. Further, Rone admitted she was active on Facebook during the time the posts were made and removed. Rone simply says she did not do it. In *Clay*, the subject post did not even contain the name or likeness of *Clay*, 151 So. 3d at 1021 (¶13). Conversely, it is undisputed that the posts came from Rone's account as illustrated by her name and profile picture. Further, no evidence of account "cloning" or "hacking" was presented. None of the tell-tell signs of hacking or cloning were present in Rone's case, as illustrated by the testimony of Wilder, Eubanks, Dr. Hey, and Rone. Of interesting note, Rone testified that her mother, daughter, and husband all had access to her phone on the date in question. Rone testified that her mother and daughter were with her in the truck that day during the time these posts were made. Yet Rone did not call any one of them to testify regarding her Facebook usage, her purported explanation regarding the posts, or the allegations in general. In fact, no one from the school, former students, or parents of current students testified on her behalf.

¶59. There was substantial evidence to support the Board's decision to terminate Rone and at worst, the testimony and evidence presented here was a "he said/she said" scenario like in *Harris*, *supra*. The lead opinion argues *Harris* is not similar or controlling. However, in *Harris*, just as with Rone, the Board heard allegations of inappropriate conduct that the teacher denied. *Harris*, 655 So. 2d at 900. There was no actual proof of the offending conduct. A student alleged Harris touched her inappropriately, and Harris said he did not touch the student in an inappropriate manner. *Id*. After hearing the testimony, the Board gave

32

more weight to the allegations and terminated the teacher. *Id*. at 900-01. "According to the termination letter sent by the Board to Harris, the more credible evidence proved he had assaulted Houston." *Id*. at 902. "Apparently, after the he said/she said drama of the hearing, the board chose to believe Houston. Where there is a conflict of testimony presented to the board, the board is entitled to determine which testimony it will give the most weight." *Id*. It does not matter that reasonable minds could have come to a different conclusion. There was credible testimony to support Rone's termination.

## II. *Was there substantial evidence to support Rone's termination for failing to adequately protect her social media account?*

¶60.    Regardless whether Rone made the offensive Facebook posts, she was also terminated for failing to adequately protect her Facebook account. There was substantial evidence to support Rone's termination for failing to adequately protect her social media accounts, specifically Facebook. Rone said she did not make the posts. While substantial evidence supports that Rone made those posts, she is undeniably guilty for failing to adequately protect her Facebook account regardless of the device used. Rone admitted that she did nothing, not even the bare minimum, which would have been to protect her phone with a password. Rone admitted throughout her testimony that she did not take any steps to protect and limit access to her phone and her Facebook account. Rone stated she only had access to Facebook through her cell phone. Rone did not own a computer. As such, the only device she needed to secure was her cell phone. She was aware of the policy and ignored it. She admitted she ignored the policy.

33

¶61. The District's employee policy states that "with the prevalence of technology and social networking, professional conduct must be maintained in these arenas as well to protect individuals' rights and the integrity of the institution." Rone never once denied that she wholly failed to abide by the District's policy. Facebook could be openly accessed by anyone in possession of her phone or with access to her phone. The dismissal of Rone, on the sole ground that she violated District policy by failing to protect her social media accounts, is justifiable and supported by the only evidence needed: Rone's own admission. "Where the record supports one valid and viable reason to dismiss a teacher, that fact cannot be sidestepped, and the board's decision will not be disturbed." *Hester*, 137 So. 3d at 329 (¶14) (quoting *Spradlin*, 515 So. 2d at 899).

¶62. Under either analysis, the termination of Rone was supported by substantial evidence in the record. Nothing more is required. To ignore decades of precedent by looking at criminal standards of authentication is misguided. Requiring anything more of the Board here is impossible. Neither party refuted the fact that absent an admission by Rone, there was no way to definitively prove who made the posts. The people in the vehicle with her all day Sunday—her family, who could have testified that they did not see Rone make the racist posts—did not testify and did not write letters. Assuming Rone did not in fact make the subject posts, then someone with her used her phone and made the posts. This is precisely why the school district has a policy requiring teachers like Rone to protect access to their

social media accounts.[13]

¶63.   Ignoring statutory guidelines governing termination hearings and decades of caselaw, which is in essence what the lead opinion advocates, is impossible and also dangerous. Affirming the chancellor's decision will open the door for teachers like Rone to post offensive and racially charged comments, delete them, and say, "It wasn't me." Affirming the chancellor's decision will say its acceptable for teachers to ignore policy regarding adequate protection of social media accounts; allow harmful actions to occur, as the current case illustrates; and be excused with another, "It wasn't me." Such a reality is not good for Mississippi.

¶64.   The comments made on Rone's Facebook page and the sentiments the comments convey could easily be projected onto her students. Teachers have a role in shaping students's self-esteem and awareness.  Because of that, the teacher's creed encourages the teacher to embody a model of decorum and respect that guides and honors students. That model of conduct does not end the moment Rone steps out of the classroom. If anything, that should be exemplified in settings away from the classroom. That decorum also includes the use and management of social media. Just as judges wear the robe at all times, so do teachers carry the apple.

---

[13] Even according to the lead opinion Rone remained logged into her Facebook account on her cell phone, making accessible to anyone who has access to it. Because she did not secure it, it was a violation of the District's policy. Once again, the Board, as the trier of facts, took all of the evidence into account and properly found Rone was in violation. Any other interpretation clearly makes this court the fact finder, which our limited review rejects.

¶65. Because I believe the Board had substantial evidence to terminate Rone, I dissent.

**CARLTON, P.J., McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**