ON WRIT OF CERTIORARI

KING, Justice,
for the Court:
¶ 1. Scott Smith was convicted of capital murder for the death of seventeen-month-old Ally Waldrop and sentenced to life without the possibility of parole. Smith appealed his conviction to the Court of Appeals, arguing that the trial court erred in admitting several Facebook messages into evidence and that the testimony of an investigator violated the Confrontation Clause. The Court of Appeals found no reversible error and affirmed. Smith filed a Petition for Certiorari arguing that the Court of Appeals erred in holding that the Facebook messages were sufficiently authenticated, that the Court of Appeals erred by finding that an email from Face-book was not inadmissible hearsay, and that the Court of Appeals erroneously applied a harmless-error analysis to the violation of Smith’s confrontation rights. We granted certiorari. On certiorari, we limit our review to Smith’s claim that the Face-book messages were not sufficiently authenticated. We find that Smith’s claim has merit; however, because the error was harmless, we affirm Smith’s conviction and sentence.
FACTS AND PROCEDURAL HISTORY
¶ 2. Some of the following facts and history were adopted from the Court of *427 Appeals’ opinion. Smith married Jenny Waldrop[1] on April 16, 2010. Waldrop had two children, two-or three-year-old Ethan[2] and seventeen-month-old Ally, from a previous relationship. Waldrop worked at the Subway located in the local Walmart. Because they had only one vehicle, Smith typically drove Waldrop to and from work. Smith would care for Ethan and Ally while Waldrop was at work.
¶ 3. On May 28, 2010, Smith took Wal-drop to work at 4:00 p.m. Ethan and Ally were with him in the car, and Ally did not have any head injuries. At about 8:00 that evening, Smith called Waldrop at work and told her that Ethan had hit Ally on the head with an iron. He called Waldrop again around 9:00 p.m. and told her that Ethan had hit Ally again with the iron, and that Ally had consequently fallen backward into the wall.[3] Smith then told Waldrop that he had called the hospital and that the hospital told him to watch Ally,[4] and also that he had called his aunt, a nurse, and that one of his aunt’s 'friends was on the way to the house to check on Ally. At about 9:30, Smith called Waldrop again to inform her that a nurse had examined Ally and that she was fine.
¶ 4. Waldrop got off of work around 10:00 p.m. Her manager testified that she clocked out at 10:08 p.m. Waldrop testified that, at about 10:10 p.m., Smith had yet to arrive to pick her up. She called Smith and he informed her that the car had broken down and that he was on his way. Waldrop testified that when Smith arrived, the children were not with him. One of Waldrop’s co-workers also testified that she observed Smith pick up Waldrop at about 10:10 p.m. and that the children were not with him.[5] Waldrop testified that Smith told her that he had already put the children to bed.[6] As soon as they returned home, Waldrop went to check on the children and found that Ally was not breathing, her eyes were half-closed, and she had a knot on her head. At that point, Waldrop testified that she started screaming for Smith to call 9-1-1.
¶ 5. An ambulance was dispatched at 10:19 p.m. and arrived at the residence at 10:21 p.m. Matt Lee, an EMT paramedic with Wayne General Hospital, testified that he responded to the 9-1-1 call on May 28, 2010. He testified that he could not find Ally’s pulse nor could he see respira- *428 tions, so he attempted to intubate her. Lee testified that he was unable to intu-bate her because the scene became unsafe. He stated that Smith began to use vulgar language and questioned why they were not at the hospital yet. The ambulance left for the hospital and arrived at Wayne General Hospital at 10:26 p.m.
¶ 6. Jennifer Williams, the Wayne General Hospital emergency room nurse, testified that on May 28, 2010, she received a phone call at approximately 8:00 p.m. asking what to do for a young child who was struck in the head with an iron by a sibling. Williams testified that at approximately 10:00 or 10:30 that night, she received a one-year-old child in the emergency room with the symptoms reminiscent of those described in the 8:00 p.m. phone call. She testified that the patient was bluish, pale, not breathing, and unresponsive when she arrived. She also testified that the patient had various stages of bruising in various places on the body, including several bruises to the head.
¶ 7. Wesley Waites, a criminal investigator with the Waynesboro Police Department, testified that he responded to a call from the hospital regarding Ally’s death. Waites testified that Ally had numerous bruises all over her body and that a portion of the back of her head was soft and spongy. Waites testified that Smith informed him that the injuries were caused by Ethan hitting Ally in the forehead with an iron, and Ally falling four to six inches into the wall, striking the back of her head. Waites asked Smith if he would give a blood sample, and Smith refused. Waites proceeded to get a search.warrant for a blood test for Smith and was able to have his blood drawn at approximately 6:30 a.m. on May 29, 2010. Shan Hales with the Mississippi Crime Laboratory testified that the crime lab performed an alcohol analysis and a drug screen on Smith’s blood and the blood contained .06% ethyl alcohol. Hales opined that a person’s body generally eliminates alcohol at a rate of approximately .02% per hour, with the elimination rate range spanning from .01% to .03% per hour.[7]
¶ 8. Waites testified that he went to the residence at which Ally was injured and did not find any blood or indentations on any of the walls. He also recovered an iron from on top of a washing machine. Waites testified that he did not see any blood on the iron.
¶ 9. Waites and another investigator interviewed Smith at the police station for nearly two hours. This interview was videotaped, and a DVD recording of the interview was entered into evidence without objection. During the interview, Smith maintained his story that Ethan had hit Ally with an iron, and that he did not know how her other injuries occurred, nor did he know how the severe nature of the injuries occurred. He maintained that Ally was “fine” during his custody. Importantly, he admitted multiple times that he was the sole custodian of Ally during the evening of May 28, 2010, when the injury occurred, and that no other adults were in Ally’s presence that evening, until Waldrop got off work at about 10:00 p.m.
¶ 10. Dr. Adele Lewis, the pathologist who performed Ally’s autopsy, testified at length about the injuries Ally suffered. She testified that her external examination revealed that Ally had “multiple injuries to her head, to her face, behind her ears, to her chest, to her upper thigh, and to her vagina,” many of which “occurred at or *429 around the time of her death.”[8] Ten photographs of these injuries were admitted into evidence.[9] Dr. Lewis also testified that some of the injuries were in locations that were “very unusual for an accidental injury to a child.” Additionally, some of the scrapes and bruises were older. Dr. Lewis testified that the internal examination of Ally revealed “a great deal of bruising all over the child’s scalp, on the underneath of her scalp. She also had multiple fractures of her skull. She also had bleeding on her brain, some bleeding behind her eyes, and injuries to her brain.” As to the head injuries, she opined that “[i]t takes a great deal of force to produce that sort of injury.... [Children] don’t sustain injuries like this in the course of their normal, everyday lives. It takes a person with the strength and coordination of an adult to inflict this type of injury.” (Emphasis added.) She then stated her medical opinion that it was impossible for a two-or three-year-old child to inflict those kinds of injury on another:
Q: Is it possible — is it medically possible, in your opinion, for a two-and-a-half or three-year-old child to inflict those kinds of injuries on another with some sort of instrument or weapon?
A: No.
Q: That is not medically possible?
A: Not in my opinion, no.
¶ 11. Dr. Lewis also revealed that the internal examination confirmed that the bruising to Ally’s chest and thigh were recent, and that “the blood extended into the deep, soft tissue of the body.” She further found that Ally had no heart or lung disease “or anything else wrong with her,” and that the autopsy revealed no “other reason to explain her death.” She also found nothing in her toxicology work to explain Ally’s death.
¶ 12. Dr. Lewis concluded to a reasonable degree of medical certainty that the manner of Ally’s death was homicide and that the cause of death was blunt-force injuries to the head. She noted that the bruising that did not contribute directly to Ally’s death was “significant not so much as the cause of death, which is, obviously, the severe injuries to the child’s head, but to the manner of death and to showing that many of these injuries were not accidental in nature and that they appear to be inflicted.” She again opined that a two- or three-year-old child could not have caused the injuries responsible for Ally’s death:
Q: ... It has been or it was alleged or told that the child was standing approximately four to six inches from a wall in the home when a two-and-a-half to three-year-old sibling hit her with an iron, a clothes iron, in the head not once, *430 but twice. The child fell back and hit the wall from that distance. My question to you is, is that — the injuries that you saw, is that medically possible for that to have occurred?
[[Image here]]
A: That story is not consistent with the injuries I saw with this child.
Q: And why not?
A: Again, these injuries were inflicted by someone with the strength and coordination of an adult. A small toddler child — this was a 17-month-old child — is not going to be able to generate enough force just falling backwards four to six inches into a wall in order to inflict those injuries on her head. And similarly, a three-year-old child is not going to be able to wield an iron with enough force to inflict this sort of injury.
Q: So you’re confident that this is a homicide?
A: Yes, I am.
¶ 13. Witnesses testified that Ally had been injured while in Smith’s sole custody before. Waldrop testified that, a few weeks before Ally’s death, Ally was injured while Smith was caring for her, and Smith informed Waldrop that Ally had fallen down the stairs. Waldrop’s boss, Sara Gardner, testified that she noticed bruising on Ally’s face and legs on May 21, 2010, and every day thereafter that she saw Ally. She testified that she asked Wal-drop what had happened to Ally and that Waldrop told her that Scott said Ally fell down the stairs. Gardner also testified that Scott was present when Waldrop told her this.
¶ 14. Additionally, several people testified that Smith complained about Ally and wanted her gone. Waldrop testified that Smith wanted her to find someone else to care for Ally and that his primary complaint was that she cried a lot. Terri Nettles, a friend of Waldrop’s, testified that Smith “said it was they [sic] would probably be better if Ally would just quit screaming and crying.” Nettles testified that Ally did indeed scream and cry, because she was teething. Paula Chafin, with whom Smith, Waldrop, Ethan, and Ally lived for two or three weeks during May 2010, testified that Smith kept the children while Waldrop was at work and that “the little girl stayed in the bed most of the time.” She testified that she and Waldrop had a discussion about whether Chafin would take Ally, and that Waldrop did not want to get rid of Ally.
¶ 15. To that end, the State introduced two Facebook messages and one email notification containing a Facebook message.[10] Two of the messages purported to be from Smith to Waldrop. The third message was from Waldrop to Smith. Two of the Face-book messages introduced were cut off at the right margin, thus giving an incomplete account of what the messages contained. Aside from the eliminated right margin, the Facebook messages purported to contain conversations regarding the marriage between Smith and Waldrop, the fights they were having, and the problems with Ally that Smith had, specifically with how much she cried. One of the messages purporting to be authored by Smith noted that “[I] feel my temper building and [I] know [I] will hurt someone, they are playing with fire and have no clue.” To authenticate the letters, Waldrop testified that she and Smith would write letters to each other on Facebook. She further testified as follows:
Q: Did he — did he give you indications in your Facebook discussions or letters, ... that he wanted it to be just the *431 three of you, you, Ethan, and him, and not Ally?
A: Yes, sir.
Q: Did he indicate to you in those communications that he felt like he was, for a lack of a better term, about to boil over with anger?
A: Yes, sir.
Q: Jenny, I am going to show you copies of three documents, and I want you to look at these and tell me if you can identify what they are.
A: It’s my Facebook messages.
Q: It’s Page 1 — it’s three pages. What is the second page?
A: It’s my Facebook letter to him.
Q: And?
A: His Facebook letter to me.
Q: So the first short one—
A: —was his.
Q: The second one is yours. And the last one is his?
A: Yes, sir.
At this point in the testimony, Smith objected to the admission of the Facebook messages into evidence as hearsay and as not being properly authenticated. The trial court overruled the objection, and the Facebook messages were admitted.
¶ 16. The jury convicted Smith of capital murder, and the trial court sentenced him to life without parole. Smith filed a motion for judgment notwithstanding the verdict (JNOV) and/or a motion for a new trial, which the trial court denied. Smith then appealed his conviction to the Court of Appeals, arguing that the trial court erred in admitting the Facebook messages because they were not authenticated and were hearsay,[11] and that certain testimony by Waites violated the Confrontation Clause.[12] The Court of Appeals found that the Facebook messages were properly authenticated.[13] It found that Waldrop’s testimony properly authenticated the Face-book messages, relying on Kearley v. State, 843 So.2d 66 (Miss.Ct.App.2003). Smith filed a petition for writ of certiorari with this Court, which we granted. M.R.A.P. 17. On certiorari, we limit our review to the question of whether the two Facebook messages sent from Smith to Waldrop were properly authenticated, a question of first impression with this Court. See Guice v. State, 952 So.2d 129, 133 (Miss.2007) (Supreme Court “unquestionably” has the authority to limit the issues on review).

ANALYSIS

¶ 17. We review the admission of evidence for abuse of discretion. Young v. Guild, 7 So.3d 251, 262 (Miss.2009). Moreover, this Court will not reverse a conviction unless the trial court abused its *432 discretion in a manner that was prejudicial to the accused. Sewell v. State, 721 So.2d 129, 138 (Miss.1998).
¶ 18. Mississippi Rule of Evidence 901 governs the requirements of authentication of evidence, stating that the authentication requirement “is satisfied by-evidence sufficient to support a finding that the matter in question is what its proponent claims.” M.R.E. 901(a). Authentication is a condition precedent to admissibility. Id. A party must make a prima facie showing of authenticity, and then the evidence goes to the jury, which ultimately will determine the evidence’s authenticity. Young, 7 So.3d at 262. Rule 901 gives examples of how the authentication requirement may be met:
(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
(1) Testimony of Witness With Knowledge. Testimony that a matter is what it is claimed to be.
[[Image here]]
(4) Distinctive Characteristics and the Like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.
M.R.E. 901(b)(1) & (4). Electronic evidence may be authenticated by the traditional means, and is adequately covered by the current rules of evidence. See State v. Eleck, 130 Conn.App. 632, 23 A.3d 818, 823 (2011). However, “the circumstantial evidence that tends to authenticate a communication is somewhat unique to each medium.” Id.
¶ 19. The authentication of social media poses unique issues regarding what is required to make a prima facie showing that the matter is what the proponent claims. Creating a Facebook account is easy. Mil-lier, Samantha L., Note, The FaceBook Frontier: Responding to the Changing Face of Privacy on the Internet, 97 Ky. L.J. 541, 544 (2008-09). “[AJnyone at least thirteen years old with a valid e-mail address could create a profile.” Petrashek, Nathan, The Fourth Amendment and the Brave New World of Online Social Networking, 93 Marq. L.Rev. 1495, 1506 (Summer 2010). To create a profile, a person must go to www.facebook.com, enter his or her full name, birth date, and email address, and register a password. Facebook then sends a confirmation link to the registered e-mail, which the person must click on to complete registration. Miller, 97 Ky. L.J. at 544. Not only can anyone create a profile and masquerade as another person, but such a risk is amplified when a person creates a real profile without the realization that third parties can “mine” their personal data. Id. at 542. Friends and strangers alike may have “access to family photos, intimate details about one’s likes and dislikes, hobbies, employer details, and other personal information,” and, consequently, “the desire to share information with one’s friends may also expose users to unknown third parties who may misuse their information.” Id. at 542-43 (describing a study done by an internet security company using “Freddi Staur,” a toy frog with a Facebook account, who “friended” several people on Facebook and was able to access their personal information). Thus, concern over authentication arises “because anyone can create a fictitious account and masquerade under another person’s name or can gain access to another’s account by obtaining the user’s username and password,” and, consequently, “[t]he potential for fabricating or tampering with electronically stored information on a social networking sight” is high, and poses challenges to authenticating printouts from the website. Griffin *433 v. State, 419 Md. 343, 19 A.3d 415, 421-22 (2011); see also Eleck, 130 Conn.App. 632, 23 A.3d at 822 (“an electronic communication, such as a Facebook message, ... could be generated by someone other than the named sender”); Campbell v. State, 382 S.W.3d 545, 550 (Tex.App.2012) (“Fa-cebook presents an authentication concern that is twofold. First, because anyone can establish a fictitious profile under any name, the person viewing the profile has no way of knowing whether the profile is legitimate. Second, because a person may gain access to another person’s account by obtaining the user’s name and password, the person viewing communications on or from an account profile cannot be certain that the author is in fact the profile owner.” (internal citations omitted)).
¶ 20. Because of the special concerns regarding fabrication, “the fact that an electronic communication on its face purports to originate from a certain person’s social networking account is generally insufficient standing alone to authenticate that person as the author of the communications.” Campbell, 382 S.W.3d at 550 (citing Tienda v. State, 358 S.W.3d 633 (Tex.Crim.App.2012) (“That an email on its face purports to come from a certain person’s email address, that the respondent in an internet chat room dialogue purports to identify himself, or that a text message emanates from a cell phone number assigned to the purported author — none of these circumstances, without more, has typically been regarded as sufficient to support a finding of authenticity.”)). Therefore, something more than simply a name and small, blurry photograph purporting to be Smith is needed to identify the Facebook account as his in the first place.
¶ 21. The ease with which defendants and alleged victims alike could fabricate a social media account to corroborate a story necessitates more than a simple name and photograph to sufficiently link the communication to the purported author under Rule 901. The court in Tienda surveyed cases and noted what that “something more” may be to adequately present a prima facie case of authentication. Tienda, 358 S.W.3d at 639-41. For example, the purported sender admits authorship, the purported sender is seen composing the communication, business records of an internet service provider or cell phone company show that the communication originated from the purported sender’s personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have access to the computer or cell phone, the communication contains information that only the purported sender could be expected to know, the purported sender responds to an exchange in such a way as to indicate circumstantially that he was in fact the author of the communication, or other circumstances peculiar to the particular case may suffice to establish a prima facie showing of authenticity. Id.; see also Griffin, 419 Md. 343, 19 A.3d at 427-28 (social media may be authenticated by testimony from the purported author, by searching the purported author’s computer and examining the computer’s internet history and hard drive, or by obtaining information directly from the social networking website that links the profile and posting to the purported author); Commonwealth v. Williams, 456 Mass. 857, 926 N.E.2d 1162 (2010) (social media was not properly authenticated where there was no testimony “regarding how secure such a Web page is, who can access a Myspace Web page, whether codes are needed for such access, etc.”).
¶ 22. In Eleck, the defendant sought to impeach a state witness with a Facebook message purporting to be from the wit *434 ness. Eleck, 130 Conn.App. 632, 23 A.3d at 820. The message was from a Face-book account bearing a user name matching the name of the witness. Id. The defendant testified that the account profile contained photographs and other entries identifying the witness as the holder of the account, and that after the witness testified, the account had removed the defendant as a “friend.” Id. at 821. The messages also contained a vague statement that the “past is the past,” which the defendant argued was a reference to the assault he was alleged to have committed. Id. at 820 n. 2, 824. The witness testified that the Facebook account was indeed hers, but she denied sending the messages, testifying that someone had “hacked” into her Facebook account two to three weeks prior, and had changed her password such that she had subsequently been unable to access it. Id. at 820. The court held that, although the suggestion that the witness did not author the messages because the account was “hacked” was “dubious under the particular facts at hand, given that the messages were sent before the alleged hacking of the account took place, [the witness’s] testimony highlights the general lack of security of the medium.” Id. at 824. Thus, the court found that the defendant did not offer the proper foundational proof to authenticate that the messages came from the witness, and not simply from her Facebook account. Id.
¶ 23. In United States v. Jackson, the defendant attempted to introduce website postings from two white supremacist websites to exonerate herself, in an attempt to prove that these white supremacist groups, and not the defendant, sent the racist hate mail that the defendant was accused of sending. United States v. Jackson, 208 F.3d 633, 636-37 (7th Cir.2000). The court stated that to authenticate the website postings, the defendant “needed to show that the web postings in which the white supremacist groups took responsibility for the racist mailings actually were posted by the groups, as opposed to being slipped onto the groups’ web sites by [the defendant] herself, who was a skilled computer user.” Id. at 638. The court found that the defendant was unable to so authenticate the website postings. Id.
¶ 24. Similarly, in this case, the State failed to provide evidence sufficient to support a finding that the Facebook messages from Smith were what the State claimed. The State failed to make a prima facie case that the Facebook profile from which the messages came belonged to Smith, as the only information tying the Facebook account to Smith was that the messages purported to be from a “Scott Smith” and were accompanied by a very small, grainy, low-quality photograph that we can only assume purported to be Smith.[14] No other identifying information from the Facebook profile, such as date of birth, interests, hometown, or the like, was provided.
¶ 25. The State likewise failed to make a prima facie case that the messages were actually sent by Smith. The only information tying the actual messages to Smith was Waldrop’s testimony that they were Smith’s messages to her. This does not suffice as the testimony of a witness with knowledge, because the State utterly failed to provide any information as to the basis of her purported knowledge. She did not testify as to how she knew that the Face-book account was Smith’s, nor did she testify as to how she knew that Smith actually authored the Facebook messages. Furthermore, the information contained in the Facebook messages was known not only to Smith, but to Waldrop and appar *435 ently to several of her friends and family members. Additionally, the messages provided do not appear to be part of the same conversation; thus it does not appear that Smith’s messages are replying to anything in Waldrop’s message. Also, no testimony regarding the security of or access to Smith’s Facebook account was elicited. Indeed, cases in which romantic partners have accessed social networking accounts illustrate the susceptibility of social media accounts to security breaches. See Campbell, 382 S.W.3d at 552 (defendant and his girlfriend, the victim, were the only ones who had access to his Facebook account, however, his girlfriend testified that she could not access the account at the time the messages were sent and she did not send the messages to herself); Simmons v. Commonwealth, 2013 WL 674721, at *1 (Ky. Feb. 21, 2013) (law enforcement officers obtained sexually suggestive messages between an adult and a middle-school student because the adult’s girlfriend accessed his Facebook account when he ended their relationship).
¶ 26. The trial court therefore abused its discretion by admitting the Fa-cebook messages purporting to be from Smith’s account, because these messages were not properly authenticated. Sufficient evidence tying both the Facebook profile and the Facebook message to Smith does not exist. However, our inquiry does not end there. Errors in the admission of evidence are subject to a harmless-error analysis. Young v. State, 99 So.3d 159, 165 (Miss.2012).
¶ 27. Harmless-error analysis prevents “setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial.” Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We do not reverse a conviction for an erroneous evidentiary ruling unless “the error adversely affects a substantial right of a party,” or in other words, unless the ruling prejudiced the accused. Young, 99 So.3d at 165 (internal quotations omitted). Thus, where it is “clear beyond a reasonable doubt that the error did not contribute to the verdict,” we need not reverse the conviction. Id. (internal quotations and alterations omitted).
¶ 28. The evidence of Smith’s guilt is overwhelming. Most importantly, Smith admitted being in sole custody of Ally during the time in which she suffered the fatal injuries, and he admitted that no other adults were even in Ally’s presence during that time. Moreover, Dr. Lewis testified as to her medical opinion that Ally’s injuries were not accidental and could not have been inflicted by a child, but must have been inflicted by an adult. Additionally, Waldrop testified as to the sequence of events on the evening of Ally’s death. Waldrop’s co-worker, Nurse Williams, EMT Lee, and Officer Waites also testified as to the events of the night of Ally’s death, and their versions were substantially the same as Waldrop’s version. Waites testified that he did not observe any blood on the iron retrieved from Smith’s and Waldrop’s house, nor did he observe any blood or indentations on the wall. Williams, Lee, and Waites also testified regarding the extent of Ally’s injuries, and the jury viewed photographic evidence of her injuries. Additionally, Waldrop, Gardner, Nettles, and Chafin testified regarding Smith’s problems with Ally, and regarding Ally having been injured before while in Smith’s sole custody. The jury also viewed Smith’s nearly-two-hour interview with the police, in which he repeatedly admitted to being the only adult in Ally’s presence on the night of May 28, 2010. Furthermore, the jury was presented with evidence that Smith’s blood alcohol level was .06% approximately eight hours *436 after Ally was transported to the hospital, and heard testimony that alcohol metabolizes out of the blood at a rate of between .01% to .03% per hour. It also heard his statement to police that he had only one-half of a glass of wine at least ten or more hours before his blood was taken. Given this overwhelming evidence of guilt, particularly Smith’s admission to being Ally’s sole custodian at the time she was injured in conjunction with Dr. Lewis’s medical opinion that only an adult could have inflicted such injuries, the admission of the Facebook messages from Scott was harmless beyond a reasonable doubt.
CONCLUSION
¶ 29. We find that the Court of Appeals erred to the extent that it found that the Facebook messages purporting to be from Smith were properly authenticated. However, because the admission of these two Facebook messages into evidence was harmless beyond a reasonable doubt, we affirm the Wayne County Circuit Court’s judgment of conviction for capital murder.
¶ 80. THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED IN PART AND VACATED IN PART. THE JUDGMENT OF THE WAYNE COUNTY CIRCUIT COURT IS AFFIRMED. CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE POSSIBILITY OF SUSPENSION, REDUCTION, PROBATION, PAROLE, EARNED TIME, GOOD TIME, OR ANY TYPE OF EARLY RELEASE, AFFIRMED. APPELLANT SHALL PAY COURT COSTS OF $434.50 AND IS GIVEN CREDIT FOR 601 DAYS JAIL CREDIT.
WALLER, C.J., DICKINSON AND RANDOLPH, P JJ., LAMAR, KITCHENS, CHANDLER AND COLEMAN, JJ., CONCUR. PIERCE, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION.

. She is also referred to in the record as Jena Waldrop and Jena Smith.

. The record is unclear as to whether Ethan was two or three at the time of Ally’s death.

. Waldrop testified that this story was Smith’s explanation for Ally’s injuries, and Smith also explained that this had occurred in his nearly-two-hour interview with the police. A DVD of the interview was admitted into evidence without objection.

. Jennifer Williams, a registered nurse at Wayne General Hospital, testified that she received a telephone call at approximately 8:00 p.m. on May 28, 2010, from a woman with a deep voice who informed her that her son had hit her daughter on the head with an iron. The caller wanted to know if the child should be brought to the emergency room. Williams testified that she informed the caller that she could not offer a diagnosis over the phone, but would be happy to examine the child in the emergency room.

. The co-worker admitted that her boss had helped her word her statement to the police, but that it was true that the children were not with Smith when he picked Waldrop up from work.

. In his interview with the police, Smith stated that he left the house to pick up Waldrop at 9:55 p.m. He stated that the car shut off at a stop light, but that it started back up immediately. He claimed that the children were with him when he picked Waldrop up, and that they then returned to the house. He claimed that Waldrop took the children inside, then began screaming for him to call 9-1-1.

. In his interview with police, Smith stated that the sum total of his alcohol consumption on the evening of May 28, 2010, was about one-half of a glass of wine, which he mixed with Kool-Aid.

. She testified that those injuries had likely occurred within six to twelve hours of Ally’s death.

. Photograph one showed a large bruise and scrape near the back of Ally’s head. Photograph two showed a fresh, recent bruise on the inner part of the upper thigh, a location that is very unusual for an accidental injury to a child. Photograph three showed a large, recent bruise on Ally's left cheek, another very unusual location for an accidental injury to a child. Photograph four showed a very large bruise over the right side of the head and some bruising on both sides of the upper parts of Ally's chest, all of which occurred at or around the time of death. Photograph five showed a bruise over Ally’s left eye that appeared to be at least two days old. Photograph six showed a scrape to her nose that appeared to be older. Photograph seven also showed the bruise on Ally’s thigh. Photograph eight showed bruising on Ally’s shoulders that occurred at or around the time of death. Photograph nine showed tears around Ally’s vagina that occurred at or around the time of death. Photograph ten showed the bruise on the back of her head from another angle, and also a bruise behind her right ear that occurred at or around the time of death.

. For clarity, this Court will refer to all three documents as “Facebook messages.’’

. The Court of Appeals found that the email notification itself was not hearsay because it was an automated process. Moreover, it found that the content of the two messages sent by Smith were admissions by a party-opponent. It determined that Waldrop’s message to Smith "could be” hearsay, but that any error in its admission was harmless because Waldrop testified as to the same matters and because overwhelming evidence supported the conviction. We do not review the Court of Appeals’ holding on this issue.

. Waites testified that the State Crime Lab did not find any fingerprints on the iron. The analyst who performed the fingerprint analysis did not testily. The Court of Appeals found that 1) this issue was procedurally barred because the defense did not object on confrontation grounds; 2) and that even if there was plain error allowing review, the error was harmless. We do not review the Court of Appeals’ holding on this issue.

.We do not review the Court of Appeals decision on the authenticity of the message from Waldrop to Smith, because Waldrop admitted in her testimony that she had authored that message.

. No testimony or other evidence exists that this photograph is indeed of Smith.