# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00075-COA

**WALTER SIMPSON** APPELLANT

**v.**

**STATE OF MISSISSIPPI** APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/04/2021 |
| TRIAL JUDGE: | HON. STEVE S. RATCLIFF III |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ZAKIA HELEN ANNYCE BUTLER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CANDICE LEIGH RUCKER |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/07/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., GREENLEE AND McDONALD, JJ.

### GREENLEE, J., FOR THE COURT:

¶1. Following a jury trial in the Madison County Circuit Court, Walter Simpson was convicted of two counts of first-degree murder, one count of first-degree arson, and one count of being a felon in possession of a deadly weapon. The circuit court sentenced him to serve two life sentences for his two first-degree murder convictions, twenty years for his first-degree arson conviction, and ten years for his felon-in-possession conviction, all to run consecutively in the custody of the Mississippi Department of Corrections. Simpson appeals, challenging the authenticity of text messages admitted into evidence at trial and claiming ineffective assistance of counsel. Finding no error, we affirm Simpson's convictions and

sentences.

## FACTS AND PROCEDURAL HISTORY

¶2. On June 5, 2018, the bodies of Falonda Simpson and her adult daughter Davonda Washington were found on the kitchen floor of Simpson's home. Following an autopsy, a medical examiner determined that Falonda was stabbed four times in her neck, back, and abdomen. Davonda was stabbed fifty-four times all over her body, with eighteen of her wounds being defensive. Falonda and Davonda also suffered burn injuries after being doused in gasoline and lit on fire. A deputy-State fire marshal examined the Simpson home and determined that the fire was not started accidentally; rather, it was due to human involvement.

¶3. Walter Simpson, who was Falonda's husband and Davonda's step-father, was subsequently indicted on two counts of first-degree murder, one count of first-degree arson, and one count of being a felon in possession of a deadly weapon.

¶4. At trial, Matt Holcomb, a deputy with the Madison County Sheriff's Office, testified that on June 5, 2018, Simpson called the police and stated that he had found his wife and step-daughter deceased. At the time, they had no reason to arrest Simpson.

¶5. Investigators found bloody footprints leading from the carport to the inside of the house. They also found a burned gas can, burned paper towels, and a burned knife in the kitchen beside the victims. After assessing the crime scene, officers returned to speak with Simpson. According to Deputy Holcomb, Simpson stated that he left home a little after 3:00 p.m. to travel to a barber college in Grenada, Mississippi. After speaking with his

2

instructor, Simpson returned home. Upon entering the house, Simpson did not turn on the lights until he stumbled. Simpson stated that after he turned the lights on, he discovered the bodies of his wife and step-daughter.

¶6. Deputy Holcomb testified that while he was at the scene, he observed Simpson talking on a pink phone. After commenting on the phone's color, Simpson told Deputy Holcomb that the phone belonged to Falonda. Deputy Holcomb instructed Simpson to place the phone down so that he could collect it as evidence. As Simpson placed the phone down, Deputy Holcomb observed blood on it. Deputy Holcomb testified that after he pointed out the blood, Simpson apologized and attempted to wipe it off. Deputy Holcomb immediately stopped Simpson and collected the phone as evidence.

¶7. Russell Kirby, a criminal investigator with the Madison County Sheriff's Office, received a report from dispatch informing him that Davonda's vehicle was missing. Investigator Kirby found her Chevy Spark at a nearby gas station. Officers secured the vehicle and recovered video footage from the store. After securing the vehicle, Investigator Kirby went to the crime scene. Investigator Kirby testified it appeared that a struggle had taken place in the house. There was blood on the floors and walls, and the two victims were lying on the kitchen floor.

¶8. Simpson voluntarily agreed to be transported to the sheriff's office, where Investigator Kirby conducted an interview. Earlier that evening, Simpson had given a voluntary statement at the scene confirming that he used Falonda's Ford Focus. Once he arrived at the sheriff's office, Simpson gave another voluntary handwritten statement to officers detailing his

activities before finding his wife and step-daughter. Shortly after, officers confiscated Simpson's shoes.

¶9.     Subsequently, Investigator Kirby learned that Falonda's Ford Focus had a global positioning system (GPS) that was installed by her car dealership. Police obtained the GPS coordinates and formulated a map of the vehicle's route on the day of the murders. Contrary to Simpson's statements, the GPS showed that the car and Simpson did not leave the house until 3:54 p.m. He traveled to a house in Winona, Mississippi, where he spent approximately fifty minutes. After securing a warrant for the Winona home, police arrived at the home and discovered a burn pile that included blue jean pieces, a gas can top, and missing floor mats from Falonda's vehicle.

¶10.    On June 10, 2018, Investigator Kirby obtained a DNA sample from Simpson. George Schiro, the laboratory director at Scales Biological Laboratory in Brandon, Mississippi, received DNA samples from Simpson, Falonda, and Davonda. Schiro also received numerous pieces of evidence that contained blood, including a water bottle, a cigarette lighter, a seat controller, and the front seat on the driver's side of Falonda's vehicle. He compared the evidence to the DNA samples collected from the victims and Simpson. Schiro determined that the blood on the water bottle belonged to Davonda. The blood found on the seat controller and the front driver's seat matched Falonda's DNA sample. Simpson's DNA was found on the cigarette lighter, which officers believed started the fire.

¶11.    At trial, Kathy Anderson, a pastor and friend to Falonda, and Octavia Kirkland, Davonda's best friend, also testified for the State. According to the women, Kathy met with

4

Falonda regarding church business around 12:00 p.m. on June 5, 2018. Meanwhile, Octavia and Davonda were communicating on FaceTime. Octavia testified that Davonda told her she had been at home alone with Simpson when he groped her and exposed himself to her. While on FaceTime, Davonda attempted to leave the home to inform her mother about the incident when Simpson grabbed Davonda's arm. According to Octavia, Davonda told Simpson to let her go. Octavia's and Davonda's FaceTime call disconnected, but Davonda called Octavia back on the telephone. They also exchanged several text messages regarding the outcome of Davonda's disclosure to Falonda.

¶12. According to Simpson's phone records, Simpson attempted to reach Falonda several times by phone. After failing to reach Falonda, Simpson contacted Kathy in search of his wife. According to Kathy, Simpson stated that he needed Falonda's vehicle to get to work by 3:00 p.m. Kathy testified that around 3:00 p.m. she received a text message from Falonda explaining that Simpson had touched her daughter and that Davonda had been waiting for Falonda by the highway. Falonda's friend Marcella Head also testified that Falonda had reached out to her around 3:30 p.m. to pray for her because she was getting a divorce. Marcella stated that she heard Falonda scream before she lost contact with her. Shortly after arriving home, Simpson contacted Joiniter Jobe, his brother-in-law, and Kathy to inform them of Falonda's and Davonda's deaths.

¶13. Following a jury trial, Simpson was convicted of two counts of first-degree murder, one count of first-degree arson, and one count of being a felon in possession of a deadly weapon. Simpson now appeals, challenging the authenticity of text messages that were

admitted into evidence at trial and claiming that he received ineffective assistance of counsel.

## DISCUSSION

### I.  Authentication of Text Messages

¶14.   Simpson contends that the circuit court plainly erred by admitting text messages purportedly sent from Davonda to Octavia. Simpson argues that the messages were not properly authenticated. Simpson did not object to the admission of the evidence at trial and therefore requests that this Court review this issue for plain error. *See Davis v. State*, 130 So. 3d 1141, 1145 (¶9) (Miss. Ct. App. 2013) (If a defendant fails to raise an issue at trial, on appeal he may proceed under the "more stringent" plain-error standard.).

¶15.   "Generally, the admission or exclusion of evidence is reviewed under an abuse-of-discretion standard." *Willis v. State*, 309 So. 3d 1125, 1131 (¶11) (Miss. Ct. App. 2020) (citing *Boggs v. State*, 188 So. 3d 515, 519 (¶9) (Miss. 2016)). However, "a party who fails to make a contemporaneous objection at trial must rely on plain error to raise the issue on appeal, because it is otherwise procedurally barred." *Id*. (quoting *Starr v. State*, 997 So. 2d 262, 266 (¶11) (Miss. Ct. App. 2008)). "The plain-error doctrine requires a party to prove that an error occurred which 'resulted in a manifest miscarriage of justice.'" *Id*. "The appellate court will only invoke the court's discretion to review and correct an error if it 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Id*. (quoting *Davis*, 130 So. 3d at 1145 (¶9)). "To determine if plain error has occurred, this Court must look at whether the trial court deviated from a known legal rule, whether that deviation created an error which was plain, clear, or obvious, and whether the deviation

prejudiced the eventual outcome of the trial." *Id*. (quoting *Starr*, 997 So. 2d at 266-67 (¶11)).

¶16.    Authentication of evidence is governed by Mississippi Rule of Evidence 901. "The authentication requirement for an item of evidence is satisfied if the proponent produces evidence 'sufficient to support a finding that the item is what the proponent claims it is.'" *Id*. at (¶12) (quoting MRE 901(a)). "The rule provides examples, but not a complete list, of authentication methods." *Id*.; *see also* MRE 901(b). "A party must make a prima facie showing of authenticity, and then the evidence goes to the jury, which ultimately will determine the evidence's authenticity." *Id*. (quoting *Smith v. State*, 136 So. 3d 424, 432 (¶18) (Miss. 2014)). Our supreme court has determined that "[e]lectronic evidence may be authenticated by the traditional means, and is adequately covered by the current rules of evidence." *Id*.

¶17.    Simpson's case involves text messages, which can generally be sent only by a single device in the physical possession of the sender. *See Holloway v. State*, 270 So. 3d 1113, 1115 (¶5) (Miss. Ct. App. 2018) (citing *Commonwealth v. Koch*, 39 A.3d 996, 1004-05 (Pa. Super. Ct. 2011)). "The association of a cell phone number with a particular individual is far stronger than it is with an e-mail address, a social media account, or a traditional 'land line' telephone, all of which are more often shared or more easily accessed by others." *Id*. (citing *Butler v. State*, 459 S.W.3d 595, 601 (Tex. Crim. App. 2015)). In other words, many issues involving the authentication of social media posts or e-mails are not present with text messages. *Id*. (citing *Smith*, 136 So. 3d at 432 (¶18) ("[T]he circumstantial evidence that tends to authenticate a communication is somewhat unique to each medium.")). While our

7

supreme court has noted that the mere fact "that a text message emanates from a cell phone number assigned to the purported author without more has not typically been regarded as sufficient to support a finding of authenticity, it is surely easier to make a prima facie case to authenticate the authorship of a text message than for [that of a social media] post . . . . " *Id*. (internal quotation marks omitted) (citing *Smith*, 136 So. 3d at 433 (¶20)). A viable option for authenticating such evidence is if "the purported sender admitted authorship" or that "the communication contains information that only the purported sender could be expected to know." *Ellis v. State*, 315 So. 3d 489, 499 (¶31) (Miss. Ct. App. 2020) (quoting *Smith*, 136 So. 3d at 433 (¶21)).

¶18.    Mississippi Rule of Evidence 901(b)(1) provides that authentication can be accomplished by testimony from someone familiar with and with knowledge of an item's contents. *See Moore v. State*, 911 So. 2d 1037, 1038 (¶4) (Miss. Ct. App. 2005); *see also* MRE 901(b)(1). Here, Octavia testified that Davonda's full name and her nickname (FavPupper) were assigned to Davonda's contact information on Octavia's phone. The women were also on the phone discussing Simpson's harassment shortly before their text exchange. Further, Octavia testified that no one besides Davonda had ever contacted her from Davonda's phone.

¶19.    The text messages here advance a motive for Davonda's and Falonda's murders. They tended to show that Falonda was aware of Simpson's inappropriate advances toward Davonda and that Falonda intended to end her marriage to Simpson. In totality, the circumstances more than made a prima facie showing that the messages showed what the

State claimed—motive. "Once there is a prima facie showing of authenticity, the evidence goes to the jury, which will then determine the ultimate question of whether the evidence is what it was claimed to be." *Holloway*, 270 So. 3d at 1116 (¶6) (citing *Young v. Guild*, 7 So. 3d 251, 262 (¶36) (Miss. 2009)).

¶20.    After a review of the record, we find that there was no "violation of a legal rule that could be considered plain, clear, or obvious and was prejudicial on the result of the trial." *See Blanchard v. State*, 55 So. 3d 1074, 1077 (¶16) (Miss. 2011).

## II.    Ineffective Assistance of Counsel

¶21.    Simpson claims that his trial counsel was constitutionally ineffective for failing to object to the admission of the allegedly improperly authenticated text messages. "Generally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Willis*, 309 So. 3d at 1134 (¶27) (quoting *Swinney v. State*, 241 So. 3d 599, 613 (¶58) (Miss. 2018)). However, the appellate court "will address such claims on direct appeal when '[(1)] the record affirmatively shows ineffectiveness of constitutional dimensions, or [(2)] the parties stipulate that the record is adequate and the [appellate court] determines that the findings of fact by a trial judge . . . are not needed.'" *Id*. at 1134-35 (¶27) (quoting *Swinney*, 241 So. 3d at 613 (¶58)). Appellate courts have "also resolved ineffective-assistance-of-counsel claims on direct appeal when the record affirmatively shows that the claims are without merit." *Id*. at 1134-35 (quoting *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020)). Simpson stipulates that the record is adequate for appellate review of this issue, but the State does not. We find, however, that the claim can be resolved on direct

appeal because the record affirmatively shows that Simpson's ineffective-assistance-of-counsel claim is without merit.

¶22. To make a successful ineffective-assistance-of-counsel claim, Simpson must show that "(1) his counsel's performance was deficient, and (2) this deficiency prejudiced his defense." *Id*. at 1135 (¶28) (quoting *Ross*, 288 So. 3d at 324 (¶31)). There is a strong presumption "that counsel's conduct falls within the wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy." *Id*. Therefore, "defense counsel is presumed competent." *Id*. "[E]ven if an error is shown, counsel's performance will only be found deficient "if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id*.

¶23. Here, Simpson's counsel did not object to the admission of the text messages on the grounds of authentication but instead on the grounds of hearsay. Because we have found that the evidence was properly authenticated, there was no error in its admission. Therefore, Simpson's trial counsel cannot be found deficient for not objecting. Accordingly, this issue is without merit.

**CONCLUSION**

¶24. Based on the foregoing analysis, we affirm Simpson's convictions and sentences.

¶25. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. EMFINGER, J., NOT PARTICIPATING.**