# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01194-COA

JORDAN TERRY A/K/A TERRY JORDAN                          APPELLANT

v.

STATE OF MISSISSIPPI                                        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/19/2022 |
| TRIAL JUDGE: | HON. ELEANOR JOHNSON PETERSON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ZAKIA BUTLER CHAMBERLAIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/04/2024 |
| MOTION FOR REHEARING FILED: | |

## CONSOLIDATED WITH

## NO. 2022-KA-01278-COA

JEROME THOMAS                                            APPELLANT

v.

STATE OF MISSISSIPPI                                        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/19/2022 |
| TRIAL JUDGE: | HON. ELEANOR JOHNSON PETERSON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | ROBERT GREER WHITACRE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |

DISPOSITION:                    AFFIRMED - 06/04/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., GREENLEE AND McDONALD, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Following a jury trial, Jordan Terry and Jerome Thomas were both convicted of first-degree murder and drive-by shooting. On appeal, both argue that they are entitled to a new trial.[1] Terry argues that the trial court erred by admitting an improperly authenticated surveillance video and that the jury's verdict was contrary to the overwhelming weight of the evidence. Thomas argues that the trial court abused its discretion by admitting text messages that were hearsay. We find no reversible error and affirm in both appeals.

## FACTS AND PROCEDURAL HISTORY

¶2.     On Sunday, August 19, 2019, Earnest Myers was scheduled to meet Alexis Black at 6 p.m. at the Kroger on Interstate 55 in Jackson to drop off their four-year-old son, E.B.,[2] after a weekend of visitation with Myers. However, Black continuously delayed the meeting until midnight, claiming that she and her boyfriend (Thomas) were out of town. In truth, Black and Thomas were "hanging out" and drinking with a group of people in a parking lot on Northside Drive. As Black intentionally delayed their meeting for several hours, she and Myers exchanged a series of text messages that showed steadily increasing frustrations.[3]

---

[1] We consolidated Terry's and Thomas's separate appeals because the defendants were tried together, and their convictions arose from the same set of facts.

[2] We use initials to protect the privacy of the minor child.

[3] The messages were exchanged between Black's phone and Paige Ritz's phone. Black testified that she believed she was communicating with Myers through Ritz's phone.

2

¶3.     Around midnight, Black arrived at Kroger in her white Ford Expedition, accompanied by her boyfriend (Thomas), his brother (Terry), and her four-month-old daughter. The Expedition parked near Myers's silver Kia Soul. Myers, his girlfriend (Paige Ritz), and E.B. were waiting in the Soul. Thomas got out of the Expedition to retrieve E.B. During the exchange, Thomas and Myers began to argue. Black then exited the Expedition, retrieved E.B., and put him in the backseat of her Expedition for safety. Black then joined the argument, as did Terry and Ritz. At this point, all five adults were arguing in the Kroger parking lot while the two young children sat in the backseat of Black's Expedition.

¶4.     The argument eventually subsided, and the adults returned to their respective vehicles and left the Kroger parking lot. Thomas drove Black's Expedition, with Black in the passenger seat and Terry seated directly behind her. The children were also in the backseat. Myers drove his Soul with Ritz in the passenger seat.

¶5.     Black testified that as they left Kroger, Thomas "kind of got back triggered" and "yelled out, 'He don't know who he's f***ing with[.]'" Thomas turned the Expedition around and began following Myers's car through a residential neighborhood. When both vehicles turned onto Ridgewood Road, Thomas told Terry to "bust that thing." At that point, according to Black, Terry fired two gunshots into Myers's car,[4] one of which struck Myers in the neck and killed him. Myers's car left the road and crashed into a tree. The Expedition made a U-turn and left the scene. Terry and Thomas were later arrested and indicted for first-degree murder and drive-by shooting.

_____

[4] Black testified that she never actually saw a firearm in the Expedition and that she only knew that Terry had a gun because she heard the shots fired at Myers's car.

3

¶6.     At trial, Derrick Taylor testified that he lived on Ridgewood Road and witnessed the shooting from a distance of 200 or 300 feet. Taylor had just returned home from work and was taking his garbage cans to the street when he heard and saw the gunshots. He testified that "plain as day," he "observed a Kia Soul and a white Expedition coming like northbound on Ridgewood Road" with the Ford Expedition trailing the Kia Soul. He then saw "gunshots from the Expedition shooting at the Kia Soul." Like Black, Taylor testified that the Expedition made a U-turn and headed in the opposite direction while the Soul left the road and crashed into a tree.

¶7.     Jackson Police Officer Nicole Keys responded to the scene. She found Myers unresponsive in the driver's seat of the Soul. Myers's body was removed, and Investigator Mamie Barrett photographed the crime scene before the Soul was towed to the crime lab. Barrett later examined the Soul and the Expedition. She found two "projectile holes" in the Soul, but she did not find a projectile or a weapon in either vehicle. The gun used in the shooting was never recovered.

¶8.     Dr. David Arboe, a forensic pathologist, performed Myers's autopsy and testified that Myers died from a "gunshot wound to the neck." According to Dr. Arboe, Myers suffered a single gunshot wound that "fractured the cervical spine." The projectile was recovered during the autopsy.

¶9.     Following a jury trial, Terry and Thomas were both convicted of first-degree murder and drive-by shooting. The court sentenced each of them to concurrent terms of life in prison for murder and thirty years in custody for drive-by shooting. Terry and Thomas filed motions

4

for judgments notwithstanding the verdict or a new trial, which were denied, and then appealed. Terry argues that the trial court erred by admitting an unauthenticated surveillance video of the Kroger parking lot and that the jury's verdict was against the overwhelming weight of the evidence. Thomas argues that the trial court abused its discretion by overruling his hearsay objection to text messages sent between Black and Ritz or Myers.

**ANALYSIS**

### I.      Surveillance Video

¶10.    At trial, Jasmine Haynes, who was a detective with the Jackson Police Department at the time of the shooting, testified that after the shooting she checked with Kroger "to see if they had any surveillance" of the meeting in the store's parking lot. Haynes testified that Kroger did have surveillance footage of the meeting, that she obtained the footage from Kroger, and that she watched the video prior to trial. Haynes did not testify that the video was an accurate representation of the Kroger parking lot, that the video accurately depicted the meeting itself, or that the video offered at trial was an exact, unedited copy of the original video on Kroger's surveillance system. Nonetheless, the State moved to admit the video and publish it to the jury based upon Haynes's testimony. Both Thomas and Terry objected, arguing that the State had not properly authenticated the video.

¶11.    Outside the presence of the jury, the trial judge watched the video and then overruled the defendants' objections. The trial judge was "satisfied that there are sufficient indicators of reliability for the admission of this video" because it matched the account of the events that Black had already testified to, and because Haynes, a law enforcement officer, testified

5

that she personally retrieved the video from Kroger in the course of her investigation. The judge further noted, "[T]ypically someone from Kroger might necessarily be called. But in this instance, the Court deems that would be superfluous . . . under the circumstance presented . . . in this case." The judge also stated that she could take "judicial notice" that the video depicted the Kroger parking lot because she was "familiar with that site."

¶12.    Terry argues that the trial judge abused her discretion in admitting the video because Haynes could not authenticate the video based on personal knowledge. Citing *Conway v. State*, 915 So. 2d 521, 526 (¶¶18-19) (Miss. Ct. App. 2005), Terry argues that Haynes cannot "testify that the events on the tape accurately depict the [events] in question" because Haynes "was not present on the night the shooting occurred," nor did she personally recover or copy the tape from Kroger's surveillance system. In response, the State argues that the combination of Haynes's testimony and Black's testimony was sufficient to authenticate the video. Black testified before Haynes, and although Black did not view or testify about the video, her description of the events in the Kroger parking lot was generally consistent with the events depicted in the Kroger surveillance video.

¶13.    "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." MRE 901(a). One way to authenticate evidence is by having a "Witness with Knowledge" testify that the "item is what it is claimed to be." MRE 901(b)(1). "A party need only make a prima facie showing of authenticity, not a full argument on admissibility. Once a prima facie case is made, the evidence goes to the jury

6

and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *Wilson v. State*, 267 So. 3d 264, 270 (¶24) (Miss. 2019) (quotation marks omitted) (quoting *Walters v. State*, 206 So. 3d 524, 535 (¶32) (Miss. 2016)).

¶14.  "Authentication [of a video may] be accomplished by testimony from someone 'familiar with and with knowledge of the contents of the . . . recording . . . .'" *Id.* at (¶27) (quoting *Corrothers v. State*, 148 So. 3d 278, 310 (¶78) (Miss. 2014)); *see also Wells v. State*, 604 So. 2d 271, 277 (Miss. 1992) ("A videotape may be authenticated by someone familiar with the scene."); *Bunch v. State*, 123 So. 3d 484, 492-93 (¶¶20-21) (Miss. Ct. App. 2013) (holding that a Wal-Mart manager authenticated a surveillance video by testifying about "the setup of [the store's] security systems," that the video played at trial "accurately depicted what [he] saw on the [store's] original surveillance footage," and that he provided or directed other employees to provide the relevant footage to law enforcement).  This Court has also "held that in order for a videotape to be entered into evidence through a witness, it must be authenticated 'by someone who can testify that the events on the tape accurately depict the transaction as it occurred on the day in question.'" *Crutcher v. State*, 68 So. 3d 724, 730 (¶12) (Miss. Ct. App. 2011) (quoting *Conway*, 915 So. 2d at 526 (¶19)).

¶15.  Terry relies primarily on this Court's decision in *Conway*, which involved a murder committed outside a car wash.  *Conway*, 915 So. 2d at 523-24 (¶¶5-9).  In *Conway*, a police officer testified that he retrieved surveillance tape from the car wash, which showed all activity in the twenty-four hours prior to the murder, and placed the tape in the police department's evidence room.  *Id.* at 525 (¶16).  A detective testified that he retrieved the tape

from the evidence room and took it to a technician who copied the relevant part of the video, enhanced its clarity, and reduced its speed. *Id.* at (¶17). The detective testified that the "tape never left his sight . . . and that he was physically present when the tape was being developed into a more readable tape." *Id.* Nevertheless, the defendant objected to the video at trial, arguing that the detective could not authenticate it because he was not present on the night of the murder and did not produce or edit the tape. *Id.* at 525-26 (¶17). On appeal, this Court held that the trial court erred by admitting the video. *Id.* at 526 (¶19). We held that the detective lacked sufficient knowledge to authenticate the video because he "was not at the . . . scene and never indicated that he watched the first videotape." *Id.* In addition, we noted that the detective "was not the technician who made the edited tape," and the "State failed to prove that [the detective] had sufficient knowledge of the crime scene to be able to testify that the edited videotape accurately depicted the events on the day in question." *Id.*

¶16. In this case, as in *Conway*, the sponsoring witness lacked sufficient personal knowledge to authenticate the surveillance video. Haynes did not testify that she watched the *original* recording prior to receiving a copy from Kroger and therefore could not authenticate the video played at trial as the same video retrieved from Kroger. She also could not testify that Kroger's surveillance system was functioning properly at the time. Moreover, Haynes did not testify that the video accurately depicted the Kroger parking lot or the events depicted in it. Finally, the State did not attempt to authenticate the video through Black, the only witness with personal knowledge of the events in the parking lot. Therefore, the trial court abused its discretion in admitting the Kroger surveillance video based on Haynes's

8

testimony and without Black specifically testifying about the video's contents.

¶17. Although Terry relies on *Conway*'s finding of error, which is similar to our finding in this case, our Court in *Conway* did not reverse on this ground. Rather, this Court noted that "[n]o trial is free of error," and "to require reversal the error must be of such magnitude as to leave no doubt that the appellant was unduly prejudiced." *Id.* at 526 (¶20) (quoting *Busick v. St. John*, 856 So. 2d 304, 308 (¶9) (Miss. 2003)). Moreover, where "the weight of the evidence against the defendant is overwhelming, such error is harmless." *Id.* "We do not reverse a conviction for an erroneous evidentiary ruling unless the error adversely affects a substantial right of a party, or in other words, unless the ruling prejudiced the accused." *Smith v. State*, 136 So. 3d 424, 435 (¶27) (Miss. 2014) (quotation marks omitted).

¶18. Here, the video showed that all five adults met and engaged in a verbal altercation in the Kroger parking lot. That fact was essentially undisputed and corroborated by text messages between Black and Myers. The critical evidence on which the State's case rested, though, was not the video of what occurred in the Kroger parking lot; rather, it was Black's and Taylor's testimony about what occurred minutes later—after the two vehicles had left the Kroger parking lot, driven through a neighborhood, and turned onto Ridgewood Road. The jury clearly found that Black's testimony was credible in material respects, i.e., that Thomas directed Terry to fire the fatal gunshots into Myers's car. Accordingly, we conclude that the admission of the video of prior events in the Kroger parking lot was harmless.

## II. Weight of the Evidence

¶19. Terry next argues that he is entitled to a new trial because the jury's verdict was

against the overwhelming weight of the evidence. When we review the denial of a motion for a new trial on this ground, we "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.* In addition, we review the trial judge's decision to deny a new trial only for an abuse of discretion. *Id.* at 292 (¶21). Considering Black's testimony and the other evidence discussed above in the light most favorable to the verdict, we cannot say that the trial court abused its discretion in denying Terry's motion for a new trial.

### III.     Text Messages

¶20.    Thomas argues on appeal that the trial court abused its discretion by admitting a series of text messages into evidence because they were improper hearsay. Haynes testified that she obtained this series of messages in the course of her investigation, that the messages were exchanged between Black's phone and Ritz's phone, and that she believed that Myers actually sent the messages from Ritz's phone. Black also testified that she believed she was texting Myers at Ritz's phone number.

¶21.    The messages begin, in relevant part, at 5:14 p.m. with a message from Ritz's phone to Black's phone: "Hey i get off at 6, where do we need to bring [E.B.]?" More than one hour later, Black responded, "[W]e went out of town yesterday we otw back now imma call soon as we get in Jackson I didn't have any service." (As noted above, Black and Thomas

10

were not actually out of town; rather, they were "hanging out" and drinking in a parking lot on Northside Drive.) Another hour passed before Ritz's phone sent a message to Black's phone that stated, "This junior[5] no disrespect im not trying to wait too late to drop him off. Paige is sick and she's been working 12 hours and she has to be up at 5 to take me to work and go on another 12 hour shift. We are asking for an understanding." Another hour passed, and a series of messages were sent from Ritz's phone: "Its 9 o'clock what exactly is going on"; "Damn man we have to get up and go to work where are you"; "Its too late for a four year old to be out like this. We are tired of the miscommunication with you"; "Stop playing man. This girl has CANCER[6] and has been up all f***ing day working. Your son is asking to come home."; and "We ain't about to beat around the bush like this with you. Where. Are. You. Alexis." A response from Black's phone read, "u must want a problem. I'm on the road df I'm tired of you. we have him 24 f***in 7. don't talk shit to my girl." Ritz then responded, "WTF ain't nobody talking shit it's nine at who has they child out this time of night then we got to get up and go to work this girl got cancer and is sick so she need her rest." The two continued to send argumentative text messages before finally agreeing to meet at the Kroger on Interstate 55 around midnight.

¶22.     Our Rules of Evidence define hearsay as an out-of-court "statement" that "a party offers in evidence to prove the truth of the matter asserted in the statement." MRE 801(c). Rule 801 defines "statement" as "a person's oral assertion, written assertion, or nonverbal

---

[5] Myers's nickname was "Junior."

[6] Black testified that Ritz had "mention[ed] she had cancer."

11

conduct, if the person intended it as an assertion." MRE 801(a). Thus, to determine whether a particular text message is hearsay we must first determine whether it is a "statement" within the meaning of Rule 801 and, if it is, the purpose for which it was offered and admitted. *See Smith v. State*, 258 So. 3d 292, 309 (¶50) (Miss. Ct. App. 2018).

¶23. The various text messages at issue were not hearsay because they were not statements (i.e., assertions) within the meaning of Rule 801(a) and/or were not offered to prove the truth of the matter asserted. To begin with, several of the messages were *questions*, "not positive declarations." *Holloway v. State*, 270 So. 3d 1113, 1116 (¶8) (Miss. Ct. App. 2018) (citing *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990)). As this Court explained in *Holloway*, most questions are not "assertions" and, hence, are not "statements" or "hearsay" because "they are not positive declarations" of anything. *Id.*; *accord Alexander v. State*, 759 So. 2d 411, 415 (¶7) (Miss. 2000). Thus, Myers's or Ritz's questions about Black's whereabouts did not *assert* anything.

¶24. Some of the other messages admitted into evidence were not hearsay because they did not assert facts or any other matter that might be proved true—for instance, messages to "[s]top playing" or that "u must want a problem" are not assertions within the meaning of Rule 801(a). As the Supreme Court explained in *Alexander*, "repeated admonitions to 'shut up' [did] not fit the definition of hearsay because there were no assertions of fact." *Alexander*, 759 So. 2d at 415 (¶7).

¶25. Finally, any messages that were assertions, or "positive declarations," were not offered for their truth. The State was not trying to prove that Ritz had cancer or was "sick," that the

12

hour was late, that Myers was using Ritz's phone, or the details of any person's work schedule. None of those messages were "offer[ed] in evidence to prove the truth of the matter asserted in the statement." MRE 801(c). Rather, the messages were offered only to show that the parties involved became increasingly frustrated and argued prior to meeting in the Kroger parking lot. The hearsay rule did not prohibit the admission of those messages because they were offered for a proper, non-hearsay purpose. *See United States v. Mills*, 704 F.2d 1553, 1562 (11th Cir. 1983) (holding that testimony was not hearsay because it "was offered only to show that there had been a heated argument . . . during which Silverstein expressed his feeling that he had been cheated"—and "was not offered for the truth of the matter asserted (that Marzloff had actually cheated Silverstein)").

¶26. In summary, the trial court did not abuse its discretion by admitting the text messages at issue because the messages were not statements within the meaning of Rule 801 or were not offered for the truth of the matter asserted.

## CONCLUSION

¶27. The trial court erred by admitting the Kroger surveillance video without sufficient evidence of its authenticity; however, for the reasons discussed above, the error was harmless. Thomas and Terry's remaining issues are without merit. Therefore, their convictions and sentences are **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**