# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00747-COA

**REGINALD BUTLER A/K/A REGINALD TYRONE BUTLER**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                                                                    APPELLEE

DATE OF JUDGMENT:           06/13/2024
TRIAL JUDGE:                HON. DEBRA W. BLACKWELL
COURT FROM WHICH APPEALED:  ADAMS COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:     OFFICE OF STATE PUBLIC DEFENDER
                            BY: AMBER LAUREN STEWART
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                            BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:          TIM COTTON
NATURE OF THE CASE:         CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 05/19/2026
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     An argument among a group of men in a parking lot boiled over into a deadly shooting.  One of the men was indicted for second-degree murder.  At trial, he took the stand and claimed self-defense.  However, the evidence showed that the victim was shot twice from behind.  The jury also saw a video where the shooter bragged about killing the victim.

¶2.     The jury found the man guilty of manslaughter and he now appeals.  Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶3.     After getting off work on December 17, 2020, Reginald Butler picked up his younger

brother to get a haircut and to go Christmas shopping. While en route to the barber shop, they spotted Butler's friend, Tyron "Puff" Thomas. The two brothers tailed Puff to an empty lot known as the "living room," where they liked to hang out. Butler and Puff parked their cars side by side in the lot and Puff got into the backseat of Butler's car. The three men began to talk and smoke.

¶4. As the group hung out, a third car pulled into the lot directly behind them. Armed with a gun at his hip, Tyran "Tigger" Newman got out of the car and walked up to Butler's window, asking if he had seen Puff.

¶5. Puff got out of Butler's car and walked with Tigger to the rear to talk as a fourth car pulled into the lot.

¶6. Concerned something was about to happen, Butler grabbed a gun from the glove compartment and told his brother to get out. As the brothers got out, Eligriel "Fester" White and Bralon James stepped out of the fourth car and approached the group of men.

¶7. A heated verbal altercation then broke out between James and Puff over money. When Puff could not produce the money owed, James attempted to take Puff's gun at gunpoint as collateral. Puff refused and the argument became physical, spilling out into the street as the two wrestled on the ground.

¶8. After "dumping" James onto his head, Puff broke free from the fight and ran away in a zig-zag pattern to avoid being shot. James then turned his attention to Butler.

¶9. James approached Butler aggressively asking him "what that sh*t you were saying?"

2

According to Butler, James was armed. The two began to exchange words and then Butler shot James. After several shots had been fired, Butler ran into the woods with his younger brother.

¶10. Natchez Police responded to the scene within minutes and secured the area while James lay lifeless on the ground with a gun beside him. As detectives processed the scene "they found six gold shell casings, two spent cartridges, and a bullet fragment."

¶11. Several hours after the shooting, Butler turned himself in to police. He claimed he had shot James in self-defense.

¶12. During his video interview with police, Butler explained he was scared of James.

¶13. Two months prior to the shooting, Butler said his gun was stolen by James' younger brother, Braxton James. Butler claimed this theft had nothing to do with the current situation. Yet during the interview, Butler stated that "it was tension there with them guys against me when they see me cause they like lookin' at me like I'm ah- ah- punk, or- or- a p*ssy or something like that. Like the gang got your gun type stuff."

¶14. Butler was eventually indicted by a grand jury for second-degree murder with a firearm enhancement.

¶15. At trial, several witnesses took the stand to present the State's theory of the case—a beef between two men resulting in murder.

¶16. The medical examiner described the victim's wounds and possible bullet trajectories. He confirmed that James died from two gunshot wounds—"one to the back and one -- to the

3

right leg." The medical examiner further noted that James' wounds and clothing lacked both gunpowder and stippling marks, indicating a distance wound from a gunshot "greater than approximately three or four feet."

¶17. The detective told the jury that he "did not" "find any evidence of any gun being fired other than the defendant's forty cal[.]" Butler's gun had "fired all the shell casings found at the scene."

¶18. The State rested and Butler took the stand in his own defense.

¶19. While being cross-examined by the State, Butler expressed regret over James' death. The State pressed him and asked whether he ever bragged about killing the victim. Butler denied bragging about shooting James, not once, but eight times on the record.

¶20. In turn, the State apparently queued up a video, and a bench conference was held off the record. Once back on the record, the following exchange occurred:

> [State]:     Can I direct your attention to the screen, Mr. Butler.
> [Butler]:    Yes, sir.
> [State]:     Who is that?
> [Butler]:    **That's me.**
> [State]:     That's you.
> [Butler]:    **Yes.**

(Emphasis added).

¶21. It appears at this point in the trial the video was played, though it was not entered into evidence or transcribed for the record. After playing the video, the State continued its questioning:

> [State]:     I thought you never bragged about [killing James].

4

[Butler]:      I don't remember that.
[State]:      I thought you never –
[Butler]:      He made me angry, that's probably why I said that.

Notably, counsel for the defendant did not object to the video or the State's line of questioning.

¶22.    At the close of trial, without any rebuttal by the State, the parties moved to review the jury instructions. The court then instructed the jury on the charged offense of second-degree murder, as well as two theories of the lesser-included offense of manslaughter. The first theory was on heat of passion manslaughter, and the second "the killing of a human being 'unnecessarily' while resisting an unlawful act."

¶23.    During closing arguments the State referred back to the social media video it had played during its cross-examination of Butler:

> If you shoot a man in the back, it's murder. It ain't self defense. Nobody else fired a shot except this gun-happy defendant. And then what does he do. He brags about it. After he lies about it. Said, look, are you sorry you did it. Sorry I did it. Did you ever brag about it? No, I never bragged about it. . . . then you turn on the video and there he is. Ha ha, Braxton. That's why your brother got shot in the face.

The State then asked the jury to "give [Butler] credit for the things he's bragging about. Give him the credit for the second degree murder of Bralen James. Find him guilty."

¶24.    After deliberation, the jury found Butler guilty of manslaughter, and he was sentenced to serve twenty years in the custody of the Mississippi Department of Corrections.

**DISCUSSION**

¶25.    Butler appeals arguing that (1) the video evidence was inadmissible  because it was

5

not authenticated before use; (2) the State's jury instruction on manslaughter was unconstitutionally vague; (3) the evidence did not support a heat of passion manslaughter instruction; (4) the weight of the evidence did not support the verdict; and (5) his counsel provided ineffective assistance by failing to ask for a continuance or moving for a new trial.

### I. There was no objection to the authenticity of the video.

¶26.     In his first assignment of error, Butler protests that the State "failed to authenticate video evidence presented to the jury at trial" and argues that he is entitled to a reversal as a result.

¶27.     Butler took the stand in his own defense. During his cross-examination by the State, Butler was repeatedly asked if he bragged about killing the victim and whether he had done so on social media. Butler steadfastly denied any bragging.

¶28.     The State then presented a video to refute Butler's denials. The State played the video of Butler bragging for the jury. The record does not reflect *any* objection to the video by counsel for the defense.

¶29.     It is well settled that "the failure of a defendant to make a contemporaneous objection to an alleged error at trial procedurally bars appellate courts from hearing that issue on appeal[.]" *Clark v. State*, 233 So. 3d 832, 851 (¶39) (Miss. Ct. App. 2017). Accordingly, we find this issue waived.

¶30.     Nonetheless, even if there had been an objection as to the authentication of the video evidence, we are not persuaded by Butler's argument.

6

¶31. Authentication is governed by Rule 901 of the Mississippi Rules of Evidence. *Smith v. State*, 136 So. 3d 424, 432 (¶18) (Miss. 2014). The requirement for authentication is met with "evidence sufficient to support a finding that the item is what the proponent claims it is." M.R.E. 901(a).

¶32. A prima facie showing of authenticity for social media evidence may be made by use of the traditional methods enumerated in Rule 901 or by circumstantial evidence. *Smith*, 136 So. 3d at 432 (¶18). "Once a prima facie case is made, the evidence goes to the jury *and it is the jury who will ultimately determine the authenticity of the evidence*[.]" *Falcon v. State*, 311 So. 3d 1186, 1188 (¶7) (Miss. Ct. App. 2020) (emphasis in original) (quoting *Garcia v. State*, 300 So. 3d 945, 974 (¶94) (Miss. 2020)).

¶33. *Falcon* provides an example of determining authenticity by means of circumstantial evidence. In that case, a police informant purchased drugs from the defendant. *Id.* at 1187 (¶2). The defendant and the informant discussed the purchase of a "ball" of methamphetamine over social media—a conversation which also included discussion of the defendant's new Powerbass speakers. *Id.* On appeal, we held that the defendant's behavior, such as showing the informant his speakers and measuring out the precise amount of methamphetamine, sufficiently authenticated the messages sent from the defendant's social media account. *Id.* at 1189 (¶9).

¶34. In Butler's case, the evidence to support a showing of authenticity far exceeds that in *Falcon*. Whereas the evidence in *Falcon* was merely circumstantial, Butler's evidence was

7

direct. Butler repeatedly identified himself in the video played before the jury. Indeed, Butler even went so far as to offer an explanation as to why he apparently gave the speech that he did in the video—because either the victim or the victim's brother "made me angry."

¶35. Accordingly, we find no error.

## II. The use of the impeachment evidence in closing arguments was not improper.

¶36. Butler's second issue likewise concerns the impeachment video. The State not only published the video to the jury during cross-examination, but also referred to statements from the video during its closing argument:

> Did you ever brag about it? No, I never bragged about it. . . . then you turn on the video and there he is. Ha ha, Braxton. That's why your brother got shot in the face.

¶37. Butler argues that the State's reference to the video was so inflammatory that the trial court should have kept it out. According to Butler, the video "showcased [him] as an unrelenting . . . predator, ultimately tainting his credibility with the jury and destroying his defense."

¶38. Generally "[a]ttorneys are to be given wide latitude in making their closing arguments." *Carr v. State*, 385 So. 3d 1300, 1305 (¶14) (Miss. Ct. App. 2024) (quoting *Spiers v. State*, 361 So. 3d 643, 662 (¶71) (Miss. 2023)). "Wide latitude" entails statements that "keeps fairly within the evidence and issues involved." *Id.* However, "[p]rosecutors are prohibited from using 'tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury.'" *Id.*

8

¶39. "Where a prosecutor has made an improper argument, the question on appeal is whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Spiers*, 361 So. 3d at 661 (¶68) (internal quotation marks omitted) (quoting *Moffett v. State*, 156 So. 3d 835, 869 (¶103) (Miss. 2014)). But "not every improper comment rises to the level of reversible error." *Hearns v. State*, 313 So. 3d 533, 537 (¶12) (Miss. Ct. App. 2021).

¶40. Critically, in this case, Butler's counsel did not object during the State's closing arguments. For "the failure to object to the prosecution's statements in closing argument constitutes a procedural bar." *Ross v. State*, 954 So. 2d 968, 1001 (¶71) (Miss. 2007) (citing *Spicer v. State*, 921 So. 2d 292, 309 (¶32) (Miss. 2006)). Because Butler "did not object to the alleged improper statements, the assignment of error has been waived and his arguments are barred procedurally on appeal." *Rice v. State*, 419 So. 3d 985, 989 (¶11) (Miss. Ct. App. 2025) (quoting *Ambrose v. State*, 254 So. 3d 77, 129 (¶163) (Miss. 2018)).

¶41. Nevertheless, Butler acknowledges his failure to object at trial and requests that we conduct a "plain error" review. In his brief, Butler argues that "a prosecutor may not state facts that are not in evidence." Based on this assertion, he further argues that since "the State did not properly authenticate nor admit the . . . video into evidence," any reference to the video in closing was "also plain error."

¶42. Under a plain error analysis, "only an error so fundamental that it creates a miscarriage

9

of justice rises to the level of plain error." *Willis v. State*, 999 So. 2d 411, 414 (¶9) (Miss. Ct. App. 2008). More pointedly, "the plain-error doctrine is applied to closing arguments only when the substance of the statement is out of bounds for closing arguments." *Rice*, 419 So. 3d at 989 (¶11) (quoting *Ambrose*, 254 So. 3d at 129 (¶161)). A statement is "out of bounds" if "the prosecutor's statement [i]s so inflammatory that the trial judge should have objected on his own motion." *Gilbert v. State*, 379 So. 3d 890, 902 (¶30) (Miss. Ct. App. 2023) (quoting *Ambrose*, 254 So. 3d at 130 (¶165)).

¶43. As set out above, even Butler did not object at trial to the video's authenticity, and under heated cross-examination, admitted that he appeared in the video. Butler further *defended* the statements he made in the video. By taking the stand in his own defense, Butler shouldered the risk that he would be exposed to the State's "utiliz[ation of] the traditional truth-testing devices of the adversary process." *Harris v. New York*, 401 U.S. 222, 225 (1971). It is a cornerstone of this country that "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so." *Id*.

¶44. Having voluntarily taken the stand and admitted he appeared in the video, and having failed to object to closing statements at trial, Butler cannot now object to the references made in closing arguments regarding the video.

### III. Permitting the heat of passion manslaughter instruction was not error.

¶45. Third, Butler argues that the trial court erred by instructing the jury on heat of passion manslaughter. Butler specifically asserts that "[t]here was no factual or evidentiary basis for

10

a heat of passion manslaughter instruction in this case."

¶46. Jury instructions are reviewed under an abuse-of-discretion standard. *Smith*, 136 So. 3d at 431 (¶17); *see also Spiers*, 361 So. 3d at 654 (¶34) (quoting *Roby v. State*, 183 So. 3d 857, 872 (¶63) (Miss. 2016)). "When analyzing the grant or refusal of a jury instruction, two questions should be asked: [1] Does the instruction contain a correct statement of law[,] and [2] is the instruction warranted by the evidence?" *Mitchell v. Barnes*, 96 So. 3d 771, 775 (¶9) (Miss. Ct. App. 2012) (quoting *Beverly Enters. Inc. v. Reed*, 961 So. 2d 40, 43 (¶8) (Miss. 2007)). Upon review, "if those instructions do not fairly or adequately instruct the jury, we can and will reverse." *Id.*

¶47. Here, the instruction, which tracks Mississippi Code Annotated section 97-3-35,[1] states:

> [I]f you believe from the evidence in this case, beyond a reasonable doubt, that:
>
> (1) the defendant, Reginald Butler, on or about December 17, 2020, in Adams County, Mississippi,
>
> (2) did kill Bralon James without malice, **in the heat of passion**, but in a cruel or unusual manner,
>
> (3) or by the use of a dangerous weapon, a firearm, without authority of law, and not in necessary self-defense
>
> then Reginald Butler is guilty of Manslaughter, and it is your sworn duty to so

---

[1] "The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." Miss. Code Ann. § 97-3-35 (Rev. 2020).

find.

¶48.    The State argues in passing that "any error in giving a heat of passion instruction was invited." The record shows that defense counsel submitted and argued for a jury instruction defining heat of passion:

[Court]:       D-12[?]

[State]:       This is, I guess, an attempt to define heat of passion. I don't know – I would like to see what case law this instruction comes from because I am not familiar with it.

[Defense]:    This definition of the heat of passion comes straight from model jury – Mississippi model jury instructions.
. . . .

[Court]:       . . . And then as to D-12, D-12 is granted. That is model jury instruction 342[.]

¶49.    Crucially, "[a] defendant cannot complain on appeal of alleged errors invited or induced by himself." *Lewis v. State*, 374 So. 3d 529, 542 (¶37) (Miss. Ct. App. 2023) (quoting *Thomas v. State*, 249 So. 3d 331, 347 (¶55) (Miss. 2018)). It is clear from the record that Butler pursued the heat of passion defense at trial. Accordingly, Butler cannot now complain that instructions on this issue were improper.

**IV.    The manslaughter instruction is not unconstitutional.**

¶50.    As a fourth issue, Butler contends that the State's second manslaughter instruction was improper because its wording is so vague as to render it unconstitutional.

¶51.    Instruction No. 10, which is based on Mississippi Code Annotated section 97-3-31,[2]

reads as follows:

> [I]f you believe from the evidence in this case, beyond a reasonable doubt,
> that:
>
> (1)    the defendant, Reginald Butler, on or about December 17, 2020,
>        in Adams County, Mississippi,
>
> (2)    did kill Bralon James **unnecessarily** while resisting an attempt
>        by Bralon James to commit any felony, or to do any unlawful
>        act, or after such attempt shall have failed,
>
> then Reginald Butler is guilty of Manslaughter, and it is your sworn duty to so
> find.

¶52.    In response, the State argues that because Butler failed to raise the purported error at

trial, and failed to notify the Attorney General of the constitutional challenge, the argument

is barred on appeal.

¶53.    However, that is not our law.  "[W]e recognize that where the defendant raises an

error for the first time on appeal, and the error affects the defendant's 'fundamental,

substantive right,' we can address the error under the plain error doctrine." *Mohamed v.

State*, 323 So. 3d 532, 552 (¶64) (Miss. Ct. App. 2021) (citing *Nolan v.* State, 182 So. 3d 484,

492 (¶28) (Miss. Ct. App. 2016) (quoting *Burdette v. State*, 110 So. 3d 296, 303 (¶23) (Miss.

2013))).  Further, "[t]he [S]upreme [C]ourt has specifically stated that 'a conviction under

---

[2] "Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter."  Miss. Code Ann. § 97-3-31 (Rev. 2020).

13

an unconstitutionally vague statute violates the Due Process Clause, and is an error affecting a fundamental constitutional right.'" *Id.* (citing *Nolan*, 182 So. 3d at 492 (¶28) (quoting *Fulgham v. State*, 47 So. 3d 698, 700 (¶6) (Miss. 2010)).

¶54. Because Butler raises an unconstitutionally-vague based claim, we will address this issue.

¶55. For the jury to convict Butler of manslaughter based on Instruction No. 10, there must be evidence that he killed James "unnecessarily." Butler asserts that the statutorily derived term "unnecessarily" "does not account for self-defense nor defense of others, and . . . leaves the jury free to concoct its own definition[,]" resulting in error.

¶56. Mississippi law requires that "[a]ll words and phrases contained in the statutes are used according to their common and ordinary acceptation and meaning[.]" Miss. Code Ann. § 1-3-65 (Rev. 2005). But "[w]here a popular word is used in a statute with no statutory definition," the popular word is "accepted in [its] popular sense." *Jones Cnty. Sch. Dist. v. Covington Cnty. Sch. Dist.*, 352 So. 3d 1123, 1131 (¶20) (Miss. 2022) (quoting *Lambert v. Ogden*, 423 So. 2d 1319, 1321 (Miss. 1982)).

¶57. In interpreting the "popular sense" of a word, our Supreme Court has "frequently looked to dictionaries[.]" *Id.* (quoting *Lawson*, 75 So. 3d at 1028) (collecting authorities)). As defined by Black's Law Dictionary, the term "unnecessary" means "**Not** required under the circumstances; **not** necessary." UNNECESSARY, Black's Law Dictionary (12th ed. 2024) (emphasis added). Given this definition, the term "unnecessarily" does not preclude

a killing in self-defense or the defense of others, as both defenses encompass killings that are "necessary" or "required under the circumstances."

¶58. Further, upon appellate review, "we read all the jury instructions given as a whole, 'with no one instruction to be read alone or taken out of context.'" *Walker v. State*, 385 So. 3d 457, 466 (¶29) (Miss. Ct. App. 2023) (citing *Pulliam v. State*, 321 So. 3d 1185, 1193 (¶27) (Miss. Ct. App. 2020) (quoting *Blanden v. State*, 276 So. 3d 1204, 1210 (¶21) (Miss. Ct. App. 2018)). Instruction No. 17 was also given, and defines for the jury when a killing is "necessary":

> [T]he killing was necessary in order to protect himself from great bodily harm or death[.]

Because "unnecessarily" is defined as "**not** necessary," we find a common understanding would not render the usage of the word "unnecessary" too vague to comprehend.

¶59. By using the common or popular sense definition of the word "unnecessarily," and by taking the jury instructions together as a whole, a jury could adequately understand its statutory meaning as intended. We therefore find that the term "unnecessarily" is not unconstitutionally vague.

## V. Ineffective assistance of counsel claims are not ripe for review.

¶60. Fifth, Butler raises the issue of ineffective assistance of counsel on the premise that defense counsel failed to request a continuance or move for a new trial. Butler specifically contends that his counsel was ineffective when he failed to present any witnesses to corroborate Butler's theory of defense though such witnesses existed.

15

¶61. Ineffective assistance of counsel claims are typically preserved for post-conviction review, rather than direct appeal. *Latham v. State*, 299 So. 3d 768, 773 (¶16) (Miss. 2020). "This is because we are limited to the trial court record in our review of the claim and there is usually insufficient evidence within the record to evaluate the claim." *Norton v. State*, 394 So. 3d 1057, 1060 (¶9) (Miss. Ct. App. 2024). Therefore, our review of claims of this kind may only occur in two instances, when "[1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that [the] findings of fact by a trial judge able to consider the demeanor of witnesses, etc.[,] are not needed." *Bell v. State*, 202 So. 3d 1239, 1242 (¶12) (Miss. 2016) (quoting *Read v. State*, 430 So. 2d 832, 841 (Miss. 1983)).

¶62. Butler asserts that the former applies in this case. However, after a review of the record, we cannot say that the record affirmatively shows ineffectiveness of constitutional dimensions. Therefore, "the appropriate procedure is to deny relief, preserving the defendant's right to argue the issue through a petition for post-conviction relief (PCR)." *Dartez v. State*, 177 So. 3d 420, 423 (¶18) (Miss. 2015).

### VI. The jury's guilty verdict was not against the overwhelming weight of the evidence.

¶63. Last, Butler argues that because he "acted in necessary self-defense," the "jury's verdict is against the overwhelming weight of the evidence." Therefore he asks that his conviction be reversed and a new trial ordered.

¶64. "In determining whether a jury verdict is against the overwhelming weight of the

16

evidence[,] the court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." *Pearson v. State*, 937 So. 2d 996, 999 (¶8) (Miss. Ct. App. 2006). A new trial will not be ordered unless "the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." *Jones v. State*, 390 So. 3d 498, 503 (¶20) (Miss. 2024) (quoting *Whitten v. Cox*, 799 So. 2d 1, 13 (¶26) (Miss. 2000)).

¶65. It was the State's burden to dispel Butler's theory of self-defense beyond a reasonable doubt. For "the burden of proof to prove self-defense is not on the defendant. Rather, it lies with the State to prove that the defendant *did not* act in self-defense." *Maye v. State*, 49 So. 3d 1124, 1138 n.1 (Miss. 2010) (emphasis in original). It is further up to the jury to "weigh[] and consider[] the conflicting evidence and credibility of the witnesses and determin[e] whose testimony should be believed." *McClain v. State*, 625 So. 2d 774, 781 (Miss. 1993).

¶66. At trial, Butler's interview with the Natchez Police Department was played for the jury to hear. In the video, Butler states that James "came up to me" and was "charging at me like this." Butler demonstrated for the detective that James had his hand on his gun—located at his hip—and that he was moving forward towards Butler saying, "and what that is . . . what that is . . . whatchu, whatchu gone 'pose to be doing to my brother?" Butler continued on to explain that James "was like trying to get up in my chest with his gun." That as a result, Butler's "next move in [his] mind was defend myself."

17

¶67. Because James "was coming up to [him] aggressively," Butler argues that self-defense was necessary. But, as the State highlights in its closing argument, James "was shot in the back." In fact, the medical examiner found that "[t]he trajectory of the back wound was going up[.]" And that one possibility for this "upward [trajectory] was if [James] was bent over and then shot."

¶68. Alternatively, Butler claims that James' back wound was due to James turning his head or flinching. But James was also "shot in the back of the thigh." As the State argued in close, "[y]ou don't shoot a person in the back and then say it's self defense."

¶69. Butler further asserts that self-defense was necessary because "the dudes that was with [James] shooting at me." "I just heard pop, pop, shots going off[.]" However, the uncontested evidence at trial was that detectives only found shell casings from Butler's gun.

¶70. In response, Butler posits that the others at the scene may have picked up their casings when leaving. But initial law enforcement arrived to the scene within "forty-five to fifty seconds or lesser[,]" being only a few streets away when the call came in. The responding officer further stated that he "secure[d] the crime scene[,]" and "ma[d]e sure that no one came in and disturbed it[.]" It was within the jury's prerogative which version of events they believed.

¶71. As the sole eyewitness to take the stand, Butler contends that his version of the events should have been taken as true. "[W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, *if reasonable*, must be accepted as true,

18

*unless* substantially contradicted in material particulars . . . by the physical facts or by the facts of common knowledge." *Morrison v. State*, 332 So. 3d 396, 400 (¶19) (Miss. Ct. App. 2022) (emphasis added) (quoting *Weathersby v. State*, 165 Miss. 207 (1933)). But the evidence in this case overwhelmingly contradicts Butler's theory of self-defense.

¶72. The jury chose to believe the State's version of the shooting over Butler's. Taking the evidence as true, and viewing it in the light most favorable to the State, we determine that the jury's verdict was not against the overwhelming weight of the evidence. Accordingly, we find no abuse of discretion in the trial court's decision to deny Butler a new trial.

## CONCLUSION

¶73. Finding no reversible error with the admission of evidence or jury instructions, we affirm the trial court's rulings. We further find the record evidence sufficient to justify the jury's verdict, and forego review on effectiveness of counsel.

¶74. Butler's conviction and sentence are **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**